2005 UT 66

**STATE of Utah, Plaintiff and Appellee,**

v.

**Kathleen Jo WORKMAN, Defendant and Appellant.**

**No. 20040530.**

Supreme Court of Utah.

Oct. 4, 2005.

Mark L. Shurtleff, Att'y Gen., Kris C. Leonard, Asst. Att'y Gen., Michael S. Colby, Salt Lake City, for plaintiff.

Linda M. Jones, Andrea J. Garland, Salt Lake City, for defendant.

WILKINS, Associate Chief Justice:

¶ 1 In 2004, Kathleen Jo Workman was convicted of operating a clandestine laboratory, a first degree felony offense under Utah Code section 58–37d–5(1) (2005). Workman appeals her conviction, claiming that the district court erroneously admitted two toxicology reports. In addition, she claims that there was insufficient evidence to support her conviction. We affirm.

## BACKGROUND

¶ 2 In 2002, while executing a federal fugitive warrant on a West Valley City residence, several police officers observed items consistent with the production of methamphetamine ("meth"). A more thorough search of the residence, and the southeast basement bedroom in particular, yielded chemicals, equipment, and wall stains indicating recent meth production. Several samples taken from the residence were analyzed by Christine Wright of the Utah State Crime Laboratory, and the resulting toxicology reports positively identified meth and meth precursors.

¶ 3 The southeast bedroom also contained several personal items belonging to Workman, including her day planner, driver's license, and identification. These items were found on a bookshelf along with a Tupperware-type container holding pills and a plastic container holding a meth pipe and a glass loading rod. Workman later admitted to buying both containers, and other equipment found in the room, for household purposes. An expert identified a fingerprint on the Tupperware-type container as Workman's, although he could not say when it had been placed there.

¶ 4 Workman arrived at the residence while the officers were conducting their search. She admitted that she had been living in the southeast basement bedroom with the renter, Michael Versteeg, although she later stated that she had moved out of the residence three weeks prior to the search. Workman also admitted to previous drug use, including meth and marijuana use.

¶ 5 During pretrial discovery, the State represented that Christine Wright would be testifying to introduce the toxicology reports. On the first day of trial, however, the State filed a motion which stated that Wright had moved out of state and asked that her supervisor, Jennifer McNair, be allowed to testify in her place. Over Workman's objection, the district court ruled that Wright was unavailable and that McNair could testify as a substitute expert witness. Absent Wright's testimony, the district court ruled that the toxicology reports could be admitted under the residual hearsay exception in rule 804(b)(5) of the Utah Rules of Evidence.

¶ 6 Ultimately, the jury convicted Workman of operating a clandestine laboratory, a first degree felony offense under Utah Code section 58–37d–5(1). Workman appeals her conviction upon two grounds: (1) McNair's testimony and the toxicology reports were improperly admitted by the district court, and (2) the evidence presented at trial was insufficient to support the verdict.

## ANALYSIS

¶ 7 Workman raised several arguments in her brief, including that the toxicology reports should not have been admitted because they violated rules 803(6) and 803(8) of the Utah Rules of Evidence. However, because Workman failed to preserve these claims by specific objection below, we will not review them. *See State v. Johnson,* 774 P.2d 1141, 1144 (Utah 1989) (requiring specific preservation of claims). Nor has she made a claim of exceptional circumstances or plain error. *See State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346 (holding that, except in cases of exceptional circumstances or plain error, the preservation rule applies to all claims).

¶ 8 Workman also argues that sanctions should have been imposed on the State for discovery violations under rule 16(g) of the Utah Rules of Criminal Procedure. Because she did not seek appropriate relief under rule 16 below, we hold that her claim for relief was waived, and she is not entitled to the relief she seeks on appeal. *See State v. Rugebregt,* 965 P.2d 518, 522 (Utah Ct.App. 1998) (holding that "a defendant 'essentially waives his right to later claim error'" by

failing to request relief when unexpected testimony is introduced (quoting *State v. Larson,* 775 P.2d 415, 418 (Utah 1989))).

¶ 9 We will therefore examine only two issues: whether the toxicology reports were properly admitted by the district court under rule 804(b)(5), and whether the evidence presented at trial was sufficient to support the verdict.

## I. HEARSAY EVIDENCE

¶ 10 We first address the question of whether the toxicology reports were properly admitted. Our standard of review on the admissibility of hearsay evidence is complex, since the determination of admissibility "often contains a number of rulings, each of which may require a different standard of review." Norman H. Jackson, *Utah Standards of Appellate Review,* 12 Utah Bar J. 8, 38.(1999). We review the legal questions to make the determination of admissibility for correctness. *Hansen v. Heath,* 852 P.2d 977, 979 (Utah 1993). We review the questions of fact for clear error. *State v. Parker,* 2000 UT 51, ¶ 13, 4 P.3d 778. Finally, we review the district court's ruling on admissibility for abuse of discretion. *Eggett v. Wasatch Energy Corp.,* 2004 UT 28, ¶ 10, 94 P.3d 193.

¶ 11 The Utah Rules of Evidence provide a variety of specific exceptions to the general prohibition against hearsay evidence. Utah R. Evid. 801–804 (2004). Among these exceptions are several that depend upon the declarant's unavailability. Utah R. Evid. 804. Rule 804(b)(5) serves as the residual hearsay exception for statements where the declarant is unavailable:

> A statement not covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness [is not excluded by the hearsay rule] if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will be best served by admission of the statement into the evidence. However, a statement may

not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Utah R. Evid. 804(b)(5) (current version at Utah R. Evid. 807 (2004)).

¶ 12 The residual hearsay exception is to be used rarely and construed strictly. *See United States v. Heyward,* 729 F.2d 297, 300 (4th Cir.1984) (stating that identical federal rule 804(b)(5) is for "exceptional circumstances" and is to be used "sparingly" and "rarely"). Thus, we only allow the admission of hearsay evidence under the residual exception when the high requirements of rule 804(b)(5) are met. We find that they are not satisfied here.

¶ 13 There are at least three objections to admitting the toxicology reports as evidence under rule 804(b)(5). First, the totality of the circumstances surrounding the reports did not have sufficient indicia of reliability because of the subjective nature of the testing from which the reports were drawn. Second, McNair's testimony was insufficient to provide Workman with a fair opportunity to prepare to challenge the reliability of the reports. Third, the testing involved in the reports is materially different from the testing in cases where we have allowed substitute expert witnesses. We will discuss each in turn.

¶ 14 First, the circumstances surrounding the toxicology reports are not sufficiently reliable to satisfy the first requirement of rule 804(b)(5), that the evidence have a guarantee of trustworthiness. Hearsay statements that have sufficient indicia of reliability are admissible. *Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). For example, a statement made on one's deathbed, Utah R. Evid. 804(b)(2), or a statement contrary to one's interests, Utah R. Evid. 804(b)(3), may be admitted as hearsay because it is highly unlikely, under the circumstances in which the respective

statement was made, that cross-examination would have more than marginal utility. *Wright*, 497 U.S. at 820, 110 S.Ct. 3139. The residual hearsay exception requires a similarly high standard of trustworthiness. *Id.* at 821, 110 S.Ct. 3139. ·

¶ 15 The toxicology reports do not meet this standard due to the subjective nature of the testing from which they were drawn. The tests the Utah State Crime Laboratory conducts to determine whether a suspected substance is meth include color tests, where the substance in question is added to a certain formula, with a resulting color indicating the presence of controlled substances or precursors, and tests in which the tester must compare the results of a gas chromatograph mass spectrometer test of the substance against the results of a similar test upon a known substance. These tests depend upon subjective inferences by the testing party, based, as McNair testified, on their "training and experience."

¶ 16 We do not wish to cast any doubt upon the procedures and tests in which the Utah State Crime Laboratory engages, their scientific accuracy, or their usefulness in determining whether controlled substances or precursors are present. However, while the testing of questionable substances may be very helpful in determining whether controlled substances or precursors are present, the conclusions of those tests, by themselves, are not drawn under circumstances that meet the very high standard of trustworthiness required by rule 804(b)(5) because of the highly subjective nature of the tests and the possibility for human error.

¶ 17 Second, given the nature of the tests, it would be extremely difficult for defendants to challenge the evidence in the resulting reports without cross-examining those personally involved in the testing. As we stated in *State v. Moosman*, 794 P.2d 474, 479–80 (Utah 1990), "[s]imply because . [hearsay] might be admissible under a hearsay exception does not mean that those statements automatically pass constitutional muster. If the evidence violates a defendant's right to confront witnesses, it should not be admitted." Because there is a significant subjective element involved in the testing at issue, in-cluding a criminologist determining the results of the color tests and comparing the spectra from the gas chromatograph mass spectrometer test with the spectra from known substances, Wright's absence deprived Workman from confronting evidence presented against her.

¶ 18 This is not a case where "an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial." *Wright*, 497 U.S. at 821, 110 S.Ct. 3139. Rather, when tests like those used here by the Utah State Crime Laboratory are used at trial, a defendant should have the opportunity not only to ask how, in general, such tests are conducted, but also whether, in the particular case, the tests were conducted properly. The fact that Workman was only informed about the substitution on the day of trial further adds to her difficulty in confronting the evidence in the reports. Because the only party who could properly testify about the reports-Christine Wright, who conducted the testing-was unavailable, the reports should not have been admitted.

¶ 19 Finally, the testing involved in this case differs materially from testing in other cases where we have allowed substitute witnesses. The State cites two of our previous decisions in support of their claim that reports resulting from "routine and mechanical" testing like that performed at the Utah State Crime Laboratory can be introduced by those who did not actually conduct the tests. Neither of these cases supports that claim, however, and we decline to extend their respective holdings in order to do so.

¶ 20 In *Kofford v. Flora*, 744 P.2d 1343, 1356 (Utah 1987), we allowed a substitute expert witness to testify to the results of paternity tests. The paternity tests at issue in *Kofford*, however, are materially different from the testing in this case. As we stated in *Kofford*, before test results can be admitted, "evidence must be produced that the particular tests relied upon in this case were conducted as specified by the Standards or in an equally reliable manner." *Id.* There has been no evidence in the present case of any promulgated, rigid guidelines and standards

like those involved in the paternity testing in *Kofford.*

¶ 21 The State also cites our decision in *Moosman,* in which we held that, where a substitute expert witness's testimony would not be less reliable than the unavailable declarant's, allowing a substitute witness to testify would not violate the defendant's right to confront witnesses. 794 P.2d at 480–81. One crucial difference between *Moosman* and the present case, however, is that the substitute expert in *Moosman* participated in the tests in question, although he did not himself conduct them.

■ ¶ 22 We hold that a court may not admit the results of such testing under rule 804(b)(5) where the substitute expert witness was not personally involved in the testing, where the testing is not subject to rigorous and stringent guidelines and standards, and where there is a significant subjective element to the testing. Admission in such cases would violate the purpose of the residual hearsay exception, including the defendant's right to cross-examine witnesses. Thus the admission of the toxicology reports by the district court was an abuse of its discretion.

## II. HARMLESS ERROR

■ ¶ 23 Although we hold that the district court erred in admitting the toxicology reports, we will not overturn a conviction unless we conclude that there is a " 'reasonable likelihood that the error affected the outcome of the proceedings.' " *State v. Hamilton,* 827 P.2d 232, 240 (Utah 1992) (quoting *State v. Verde,* 770 P.2d 116, 120 (Utah 1989)). The State offers two theories to show the admission of the toxicology reports was harmless error.

¶ 24 First, the State argues that, under rule 703 of the Utah Rules of Evidence, McNair could have given basically the same testimony that she gave at trial without admitting the reports. Rule 703 states that an expert witness may base her testimony upon evidence that is not admissible as long as it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Utah R. Evid. 703. As we have noted, the tests in question

have a significant subjective element. While McNair could conceivably testify to the general nature of the tests used, how she herself has used them, or even how Wright had performed such tests in the past, she could not, relying solely upon the conclusions stated in the reports, have given probative testimony on the particular tests performed to reach those conclusions. We decline to hold that the conclusions drawn from the tests, absent personal involvement in the testing process, are the type of evidence that is "reasonably relied upon by experts in the particular field" of criminology. *Id.*

¶ 25 The State alternatively argues that there is sufficient evidence in the record, absent the reports and McNair's testimony, to support Workman's conviction. The toxicology reports and McNair's testimony support the conclusion that the substances found in the southeast basement bedroom were in fact meth and meth precursors. Workman, on the other hand, argues that the reports were crucial to the State's case, since they identified "substances that otherwise were not specified to any scientific degree." Thus our analysis of whether the erroneous admission of the hearsay evidence was reasonably likely to affect the outcome of the proceedings will be based upon whether there was sufficient evidence, absent the reports and McNair's testimony, that the room was being used as a clandestine lab, and whether scientific specificity of the substances involved was necessary for the outcome of the case.

¶ 26 Two important considerations guide our decision that the district court's error was not prejudicial. First, the State is not required to prove that controlled substances or precursors were present in the home. Of course, finding that the substances in the basement were meth or meth precursors would satisfy the relevant element of the crime; however, possessing equipment or supplies for use in a clandestine lab would also satisfy that element. Utah Code Ann. § 58–37d–4(a)–(b) (2002).

¶ 27 Second, there was adequate independent evidence presented for a jury to conclude that the bedroom was being used as a clandestine lab. Aside from the toxicology reports, other evidence was presented at trial as to both the substances and the equipment

found in the bedroom. There was testimony by a police officer with significant training in recognizing clandestine labs. All of the materials (including HEET, Red Devil Lye, iodine, Sudafed) and equipment (including glass beakers, heating elements, a condenser) necessary for the production of meth were found in the bedroom, as were stains consistent with meth production. Circumstantial evidence, including information detailing how to evade police detection and how to manufacture meth, was found in the residence as well. Finally, there was testimony by an expert in clandestine laboratories, who concluded that the bedroom was, in fact, being used as a clandestine lab for the production of meth.

¶ 28 Even if the presence of meth and meth precursors was not established to any scientific degree, a jury could reasonably infer from the wealth of other evidence provided that the bedroom was being used as a clandestine lab. Utah Code section 58–37d–4 does not require scientific certainty—and neither do we. We therefore hold that the erroneous admission of the reports was harmless error, and did not affect the outcome of the case.[1]

### III. SUFFICIENCY OF THE EVIDENCE

■■■ ¶ 29 We next turn to Workman's claim that the evidence presented at trial was insufficient to support her conviction. The standard of review for a sufficiency claim is highly deferential to a jury verdict. *State v. McClain*, 706 P.2d 603, 605 (Utah 1985). We begin by reviewing "the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict." *State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94 (citing *State v. Petree*, 659 P.2d 443, 444 (Utah 1983)). We will reverse a jury verdict for insufficient evidence only if

we determine that "reasonable minds could not have reached the verdict." *State v. Widdison*, 2001 UT 60, ¶ 74, 28 P.3d 1278 (citing *State v. Colwell*, 2000 UT 8, ¶ 40, 994 P.2d 177).

¶ 30 The Clandestine Laboratory Act makes it unlawful for a person to "knowingly or intentionally: (a) possess a controlled substance precursor with the intent to engage in a clandestine laboratory operation; [or] (b) possess laboratory equipment or supplies with the intent to engage in a clandestine laboratory operation." Utah Code Ann. § 58–37d–4(1)(a)–(b) (2005). As noted in the previous section, the evidence that the bedroom was being used as a clandestine laboratory is sufficient to support the verdict. The remaining question, therefore, is whether there is sufficient evidence of Workman's possession of the lab to support her conviction.

■■■ ¶ 31 Workman did not have actual physical possession of any controlled substances, precursors, equipment, or supplies when she was arrested. A person who does not have actual physical possession may still be convicted, however, if the State can prove constructive possession. *State v. Hansen*, 732 P.2d 127, 131–32 (Utah 1987).

> To find that a defendant had constructive possession of a drug or other contraband, it is necessary to prove that there was a sufficient nexus between the accused and the drug to permit an inference that the accused had both the power and the intent to exercise dominion and control over the drug.
>
> Whether there is a sufficient nexus ... depends upon the facts and circumstances of each case.

*State v. Fox*, 709 P.2d 316, 319 (Utah 1985).

■■■ ¶ 32 Several factors may be important in determining whether the nexus in a

1. We note that the jury also convicted Workman of three aggravating factors: first, that "intended laboratory operation [took] place within 500 feet of a residence," under Utah Code section 58–37d–5(1); second, that "clandestine laboratory operation actually produced ... a controlled substance," under Utah Code section 58–37d–5(1)(e); and third, that the "intended clandestine laboratory operation was for the production of ... methamphetamine base," under section 58–37d–5(1)(f). While there was enough evidence without the admission of the reports to satisfy the first and third factors, the jury would not have been able to find the lab actually produced methamphetamine absent McNair's testimony and the reports. However, this conclusion does not change our belief that the error was harmless because as long as Workman has been convicted of two of the three, she is ineligible for probation, thus leaving the trial court's sentence unchanged.

particular case is sufficient, including ownership and/or occupancy of the residence or vehicle where the drugs were found, presence of defendant at the time drugs were found, defendant's proximity to the drugs, previous drug use, incriminating statements or behavior, presence of drugs in a specific area where the defendant had control, etc. *See State v. Anderton,* 668 P.2d 1258, 1264 (Utah 1983); *Fox,* 709 P.2d at 319. Of course, these factors are not "universally pertinent," and we are mindful that "no such list is exhaustive, and that listed factors are only considerations." *State v. Layman,* 1999 UT 79, ¶¶ 14–15, 985 P.2d 911.

¶ 33 We have previously held that many of these factors, by themselves, are insufficient to establish the requisite nexus. *See Fox,* 709 P.2d at 320 (holding that co-occupancy of a house where marijuana was being grown, absent other evidence, was insufficient to establish a nexus); *Anderton,* 668 P.2d at 1264 (holding that co-ownership and co-occupancy of a home were insufficient to establish a nexus); *see also Spanish Fork City v. Bryan,* 1999 UT App 61, ¶¶ 2, 10, 975 P.2d 501 (holding that co-occupancy of bedroom where drug paraphernalia was found was insufficient to establish a nexus); *State v. Salas,* 820 P.2d 1386, 1389 (Utah Ct.App. 1991) (holding that ownership and co-occupancy of a vehicle, along with an anonymous informant's tip, was insufficient to establish a nexus).

¶ 34 Similar factors are present in this case. Workman was a co-occupant of the bedroom where the clandestine lab was found. Her personal items were intermingled with the equipment being used to produce meth. She uttered two statements that could imply that she had a guilty conscience.[2] She admitted to buying some of the containers and glassware that were being used in the lab. She admitted to previous drug use, including meth use. Finally, her fingerprint was found on one of the containers.

¶ 35 Taken alone, it is not likely that any one, or even a small group, of these factors would be enough to establish a sufficient nexus between Workman and the clandestine lab. However, we hold that the cumulative effect of these factors is such that a reasonable jury could have concluded that there was a sufficient nexus between Workman and the clandestine lab to satisfy the possession element of the statute.

## CONCLUSION

¶ 36 We hold that the admission of the toxicology reports was harmless error. We further hold that the evidence is sufficient to support the verdict. Defendant's conviction is therefore affirmed.

¶ 37 Chief Justice DURHAM, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice WILKINS' opinion.

---

2. After arriving at the residence, Workman was overheard telling Versteeg to tell the officers that she had been living with her sister. When asked later about a fanny pack containing meth that had been found at the residence, Workman's "immediate, unhesitating response" quickly identified the pack as belonging to someone else. Both of these statements, the State argues, could suggest "guilty knowledge that she would otherwise be connected to the meth lab in her bedroom."