IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20110027-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (December 28, 2012) |
| Fernando Gonzalez-Camargo, | ) | |
| | ) | 2012 UT App 366 |
| Defendant and Appellant. | ) | |

-----

Third District, Salt Lake Department, 091907747
The Honorable Royal I. Hansen

Attorneys:     Joan C. Watt and Andrea J. Garland, Salt Lake City, for Appellant
             Mark L. Shurtleff and Jeffrey S. Gray, Salt Lake City, for Appellee

-----

Before Judges Orme, McHugh, and Christiansen.

McHUGH, Judge:

¶1     Fernando Gonzalez-Camargo appeals his convictions of possession of methamphetamine, a third degree felony, *see* Utah Code Ann. § 58-37-8(1)(a)(iii) (LexisNexis 2012),[1] and receiving stolen property, a class B misdemeanor, *see id.* § 76-6-408(1) (elements); *id.* § 76-6-412(1)(d) (penalties). We vacate Gonzalez-Camargo's

---

[1]Where subsequent amendments to the Utah Code do not materially change the provisions relevant to our analysis, we cite the current version for the convenience of the reader.

conviction of possession of methamphetamine, and reverse his conviction of receiving stolen property and remand for a new trial on that charge.

BACKGROUND[2]

¶2      On September 29, 2009, representatives of the Utah Attorney General's Office Special Investigations and Secure Strike Force units (the agents or investigating agents) surveilled an apartment fourplex in Salt Lake City (the fourplex). They observed "[h]eavy traffic patterns to and from" the fourplex by foot, bike, and car; people who appeared to be "lookout[s]"; and "what appeared . . . to be two hand-to-hand drug transactions." Although they observed that the individuals involved in the hand-to-hand transactions came down the stairs, the agents could not determine whether they emerged from apartment B or D, both of which were located on the upper level of the fourplex. The agents did not detain any of the individuals involved in the transactions and did not know their identities. However, the agents stopped and searched one car leaving the fourplex and found electronics and construction tools in the car. There was no evidence linking Gonzalez-Camargo to any of these incidents.

¶3      Thereafter, the investigating agents coordinated with members of the Salt Lake City Special Weapons and Tactics (SWAT) team to execute a search warrant on apartments B and D around midnight on September 30, 2009. The SWAT team implemented a "surround and callout operation," which one of the investigating agents explained at trial means that "the SWAT team approaches the building [and uses] a bullhorn . . . to call the residents out of the apartment[s]." Twelve to fourteen people, including Gonzalez-Camargo and his girlfriend (Girlfriend), were then escorted from the fourplex and directed by Agent Edward Spann to sit on the curb. While detained, Gonzalez-Camargo told Agent Spann that he lived in apartment D with Girlfriend.

¶4      After the residents and guests exited the fourplex, the SWAT team entered the upper level apartments to assure that they were clear of danger. There were "dozens" of SWAT team members who entered the apartments, and they used a canine unit to assist

---

[2]"When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565.

in detecting the presence of controlled substances.[3] It is unclear how long it took the SWAT team to conduct the initial sweep and to turn the scene over to the investigating agents. One agent recalled that the SWAT team took about thirty minutes to clear apartments B and D, while other agents testified that the SWAT team had control of the premises for about an hour.

¶5 After the SWAT team released the scene, the investigating agents entered the apartments to conduct a search pursuant to the warrant. The floor plan of apartment D includes two bedrooms and a common bathroom, living room, and kitchen. The agents discovered nine baggies of methamphetamine inside a black, metal lockbox (the lockbox), which was found in the bedroom on the north side of apartment D (the north bedroom). The agents also recovered laptop computers, cellular telephones, other electronic devices, and a loaded sawed-off shotgun from the north bedroom.

¶6 At some point during the search, the agents brought Gonzalez-Camargo and Girlfriend to apartment D and seated them in the living room. Before the search was completed, Girlfriend asked the agents to retrieve something from her purse, which was located in the north bedroom. As one of the investigating agents left the north bedroom carrying laptop computers, Gonzalez-Camargo identified them as his. He explained that he was a computer repairman and volunteered that the computers were not stolen. However, the agents did not find any of the hallmarks of a computer repair business, such as customer lists or receipts, computer manuals, computer repair tools, or business cards in the apartment. In addition, one of the seized computers bore a label indicating that it was the property of Utah State University. Based on the items found in the north bedroom, the State charged Gonzalez-Camargo with possession of methamphetamine with intent to distribute, a second degree felony; receiving stolen property valued at $5,000 or more, a second degree felony; and possession of a weapon by a restricted person, a third degree felony.

¶7 At a jury trial held June 29–30, 2010, four of the investigating agents testified. Agent Spann explained that he "was assigned as the photographer to go through and take a video of the residence before the search began, and then a conclusory video after the search was concluded." He testified that the lockbox was on top of the mattress

---

[3]It is not entirely clear from the record when the drug detection dogs were used to assist in the search of the apartments.

when he first entered the bedroom. The jury also saw the video Agent Spann recorded, which shows the closed lockbox sitting atop a mattress between a pillow and a pile of blankets. It also shows a laptop computer on the floor at the foot of the mattress and a laptop computer in a case on the floor on one side of the mattress.

¶8    Agent Stephen Metcalf testified that he entered apartments B and D to conduct a follow-up safety sweep after the SWAT team had cleared the premises. He did not know if he was the first investigating agent on scene, stating, "I believe [Agent] Spann may have been in front of me. He was an individual who was assigned to photograph, and I believe he may have been in front of me." When Agent Metcalf entered the north bedroom, the lockbox was on the floor next to the mattress near two laptop computers. He indicated that the lockbox contained nine baggies of what appeared to be methamphetamine. It was unclear from his testimony, however, whether the lockbox was open when he first saw it, or was later opened, thereby revealing the drugs.

¶9    Agent Brendan Call and Agent Leo Lucey also testified at trial. Agent Call entered apartment D after the drug detection dogs and first saw the lockbox on the mattress as shown in the video, but open. Agent Call could see "baggies of methamphetamine" inside the lockbox, along with marijuana and a pipe "all on the bed." Agent Lucey testified that he entered apartment D after "a canine unit . . . as well as some of the other investigators." Agent Lucey reported that when he entered the north bedroom, the lockbox was on a chair surrounded by cellular telephones. Agent Lucey did not recall if the lockbox was open or closed.

¶10   The video and testimony reveal that, in addition to the computers and methamphetamine recovered from the north bedroom, there was a purse and a crescent wrench near the door, three cellular telephones on a chair, a cluttered computer desk, a dresser, and a mattress. The bedroom also contained cameras, video recorders, two boxes of jewelry, and a container full of money, consisting mostly of coins. There were two car stereos on the floor near the closet. The agents found new children's clothing with attached price tags, men's and women's clothing, and the sawed-off shotgun in the closet. Other items in the closet included purses, duffle bags, and makeup.

¶11   Furthermore, the State offered evidence that the computer recovered from the north bedroom bearing the Utah State University sticker had been stolen. Detective Kim Ellis of the Utah State University police relied on an incident report to confirm that the

make, model, and serial number of the computer matched a laptop reported missing from the university in August 2009. Although Gonzalez-Camargo objected to the testimony as hearsay, the trial court admitted the evidence contained in the incident report as a business record.

¶12    At the close of the State's case, Gonzalez-Camargo moved for a directed verdict, arguing that the State had failed to establish his constructive possession of the methamphetamine or shotgun and that the State had not shown an intent to distribute the methamphetamine. With regard to the computers, Gonzalez-Camargo argued that although there may be enough evidence that he was in possession "perhaps of some laptops," there was no evidence of their value. After argument on the matter, the trial court denied the motion for a directed verdict, but agreed that the State had presented no evidence of Gonzalez-Camargo's intent to distribute the methamphetamine or of the value of the computers. Accordingly, the trial court submitted the case to the jury on charges of possession of methamphetamine, a third degree felony; receiving stolen property, a class B misdemeanor; and possession of a weapon by a restricted person, a second degree felony. The jury acquitted Gonzalez-Camargo of possession of a weapon by a restricted person but found him guilty of possession of methamphetamine and of receiving stolen property.

¶13    Following the verdict, Gonzalez-Camargo filed a motion to arrest judgment on the conviction of possession of methamphetamine, which the trial court denied in a Minute Entry and Order. The court sentenced Gonzalez-Camargo to zero to five years in the Utah State Prison for possession of methamphetamine and 180 days in jail for receiving stolen property. It then suspended those sentences and ordered Gonzalez-Camargo to serve 365 days in jail and 36 months of probation.[4] Gonzalez-Camargo now appeals.

---

    [4]On his December 14, 2010 release from jail, Gonzalez-Camargo was transferred to the custody of the U.S. Marshal, pending deportation. The trial court terminated his probation and issued a $50,000 cash-only bench warrant for his arrest should he return to the United States illegally.

ISSUES AND STANDARDS OF REVIEW

¶14 Gonzalez-Camargo contends that the evidence was not sufficient to support his conviction of possession of methamphetamine. Our review of a claim of insufficient evidence "is highly deferential to a jury verdict." *State v. Workman*, 2005 UT 66, ¶ 29, 122 P.3d 639. "We begin by reviewing 'the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict.'" *Id.* (quoting *State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94). "We will reverse a jury verdict for insufficient evidence only if we determine that 'reasonable minds could not have reached the verdict.'" *Id.* (quoting *State v. Widdison*, 2001 UT 60, ¶ 74, 28 P.3d 1278).

¶15 Gonzalez-Camargo next contends that the trial court violated the bar on hearsay evidence and his constitutional right to confrontation by allowing the State to introduce testimony based on an incident report to establish that the laptop computer had been stolen. "In reviewing the admissibility of hearsay, legal questions are reviewed for correctness while the ultimate ruling on admissibility is reviewed for an abuse of discretion." *State v. Burke*, 2011 UT App 168, ¶ 16, 256 P.3d 1102 (citing *Workman*, 2005 UT 66, ¶ 10). "Matters of constitutional interpretation are questions of law that we review for correctness, and we provide no deference to the district court's legal conclusions. The district court's decision to admit testimony that may implicate the confrontation clause is also a question of law reviewed for correctness." *State v. Poole*, 2010 UT 25, ¶ 8, 232 P.3d 519 (internal citation omitted).


ANALYSIS

I. Sufficiency of the Evidence

¶16 Gonzalez-Camargo first argues that there is insufficient evidence to support his conviction of possession of methamphetamine. The Utah Code provides, "It is unlawful . . . for any person knowingly and intentionally to possess . . . a controlled substance." Utah Code Ann. § 58-37-8(2)(a)(i) (LexisNexis 2012); *see also id.* § 58-37-4(2)(b)(iii)(B) (categorizing methamphetamine as a controlled substance). Although Gonzalez-Camargo did not have any drugs on his person when he was arrested, "[a] person who does not have actual physical possession may still be convicted . . . if the State can prove constructive possession." *Workman*, 2005 UT 66, ¶ 31.

¶17 To establish constructive possession, the State must "'prove that there was a sufficient nexus between the accused and the drug to permit an inference that the accused had both the power and the intent to exercise dominion and control over the drug.'" *Id.* (quoting *State v. Fox,* 709 P.2d 316, 319 (Utah 1985)). Whether a sufficient nexus exists "'depends upon the facts and circumstances of each case.'" *Id.* (quoting *Fox,* 709 P.2d at 319). In determining whether a sufficient nexus exists to establish constructive possession, we consider several factors, including,

> [O]wnership and/or occupancy of the residence or vehicle where the drugs were found, presence of defendant at the time drugs were found, defendant's proximity to the drugs, previous drug use, incriminating statements or behavior, presence of drugs in a specific area where the defendant had control, etc.

*Id.* ¶ 32; *accord Fox*, 709 P.2d at 319. This list is not exhaustive and "many of these factors, by themselves, are insufficient to establish the requisite nexus." *Id.* ¶¶ 32–33. For example, "[o]wnership and/or occupancy of the premises upon which the drugs are found, although important factors, are not alone sufficient to establish constructive possession, especially when occupancy is not exclusive." *See Fox*, 709 P.2d at 319–20 (holding that evidence that the defendant lived in a home where marijuana was being cultivated was insufficient to support a finding of constructive possession); *see also State v. Anderton*, 668 P.2d 1258, 1264 (Utah 1983) (Durham, J., concurring) (stating that a spouse's joint ownership and occupancy of a home where drugs are found is insufficient to establish constructive possession); *Spanish Fork City v. Bryan*, 1999 UT App 61, ¶¶ 2, 10–11, 975 P.2d 501 (holding that a spouse's joint occupancy of a home where drug paraphernalia was found was insufficient to establish the spouse's constructive possession). Instead, the defendant's joint occupancy of the premises where the controlled substance is discovered must be combined with other evidence sufficient to establish the defendant's knowing and intentional control over it. *See Workman*, 2005 UT 66, ¶¶ 34–35 (holding that the cumulative effect of the evidence was sufficient to establish that defendant constructively possessed the methamphetamine laboratory discovered in a bedroom she shared with a renter); *State v. Hansen*, 732 P.2d 127, 129, 132 (Utah 1987) (per curiam) (affirming a conviction based on constructive possession where the controlled substance was found in a locked, metal box under a pile of dirty laundry in the defendant's room, a key to the box was found in the

defendant's pocket, and drug scales were found on his bookshelf). We must therefore determine whether the factors present in this case are such that a jury could have concluded beyond a reasonable doubt that there was a sufficient nexus between Gonzalez-Camargo and the methamphetamine to establish that he knowingly and intentionally possessed it.

¶18     Gonzalez-Camargo bases his argument that there was insufficient evidence to support his conviction on the State's inability to establish the initial location of the lockbox containing the methamphetamine, its failure to link him to the methamphetamine, and its failure to show that he had the ability and intent to exercise control over it. The State counters that the discovery of the methamphetamine in the north bedroom that Gonzalez-Camargo shared with Girlfriend was sufficient to establish constructive possession, particularly since Gonzalez-Camargo was present at the time of the search. In support of its position, the State argues that the video of the scene reveals that the "bedroom was dominated by his possessions" and that the first agents to enter the scene found the lockbox on the floor, intermingled with his computers.

¶19     Contrary to the State's position, the video does not establish that Gonzalez-Camargo had exclusive control of the north bedroom. Although Gonzalez-Camargo told the agents that the computers and the men's clothing were his, the video also reveals Girlfriend's purse near the door, and makeup, purses, and women's and children's clothing in the closet. Furthermore, Girlfriend directed the agents to the north bedroom to retrieve an item from her purse, and Gonzalez-Camargo told the agents that Girlfriend also lived in Apartment D.

¶20     Nor do we agree with the State that the evidence established that the lockbox was first discovered on the floor, intermingled with the laptops. The record reflects instead that none of the State's witnesses could establish where the lockbox was when the SWAT team released the scene. The four investigating agents observed the lockbox in various locations, including on the mattress, on the floor near the computers, and on a chair. In addition, the investigating agents entered after dozens of SWAT team members and a canine unit had been in the apartment for thirty minutes to an hour.[5]

---

[5]The record also reflects that the occupants of apartments B and D were alerted to

(continued...)

Accordingly, Gonzalez-Camargo argues that the lockbox "could have been found [by the canine unit] wrapped in female clothing or [in] a drawer with female possessions" and then placed on the floor, mattress, or chair for the convenience of the investigating agents.

¶21    As evidence that the SWAT team would not have moved the lockbox, the State relies on testimony from Agent Call that the SWAT team's primary purpose is to assure that the warrant is executed safely, and that "they search for people, but they don't search for items." However, as Gonzalez-Camargo's counsel noted at oral argument, there was also testimony from Agent Metcalf that "[t]he SWAT team did not necessarily execute the warrant in a normal fashion." Even if we assume that neither the SWAT team nor the canine unit moved the lockbox, the record still fails to establish where the investigating agents first discovered it. In sum, the agents who testified did not know whether the video showing it on the mattress was recorded before or after it was observed on the floor.

¶22    Additionally, more than a reasonable inference that Gonzalez-Camargo was aware of the lockbox and its contents is necessary to establish constructive possession. "[T]o prove that [Gonzalez-Camargo] had constructive possession of the [methamphetamine], the evidence must also show that he had the power and intent to exercise dominion or control over [it]." *See State v. Fox*, 709 P.2d 316, 320 (Utah 1985). In cases where contraband is discovered in a living space over which the defendant does not have exclusive control, "it cannot be inferred that he knew of the presence of such drugs and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." *State v. Anderton*, 668 P.2d 1258,

---

[5](...continued)
the presence of the officers before any law enforcement personnel entered the apartments, that twelve to fourteen people were present at the fourplex at midnight and vacated the apartments, that the agents did not know which of those people came from each apartment, and that at least some of those occupants were in the country illegally. Not surprisingly, the evidence also indicates an effort to discard incriminating evidence before exiting. For example, the investigating agents found a false identification card in the toilet. It is uncertain from the record whether someone hoping to avoid criminal liability could have tossed the lockbox containing the drugs into the north bedroom before responding to the SWAT team's command to exit the apartments.

1264 (Utah 1983) (Durham, J., concurring) (citation and internal quotation marks omitted); *see also Fox*, 709 P.2d at 320 (holding that a marijuana greenhouse located in an "openly accessible" shared area of property was not sufficient to support constructive possession, absent additional evidence of intent to possess or control). For example, in *State v. Workman*, 2005 UT 66, 122 P.3d 639, the defendant was a co-occupant of a residence where detectives discovered a methamphetamine laboratory. *Id.* ¶¶ 2–4 . They found "several personal items belonging to [the defendant], including her day planner, driver's license, and identification" on a bookshelf in a bedroom in which chemicals and evidence of recent methamphetamine production were located. *Id.* ¶¶ 3, 34. Additionally, the bookshelf contained a pill container and a plastic container holding a meth pipe and glass loading rod. *Id.* ¶ 3. The defendant's fingerprint was found on the pill container, and she admitted to purchasing it and the plastic container. *See id.* Finally, the defendant admitted to prior drug use and made statements "that could imply she had a guilty conscience." *Id.* ¶¶ 3, 34 & n.2. Based on these facts, the supreme court affirmed the defendant's conviction, stating,

> Taken alone, it is not likely that any one, or even a small group, of these factors would be enough to establish a sufficient nexus between [the defendant] and the clandestine lab. However, we hold that the cumulative effect of these factors is such that a reasonable jury could have concluded that there was a sufficient nexus between [the defendant] and the clandestine lab to satisfy the possession element of the statute.

*Id.* ¶ 35.

¶23    Unlike in *Workman*, the cumulative effect of the evidence here is not sufficient to establish that Gonzalez-Camargo was in constructive possession of the methamphetamine. Because the agents were unclear where the lockbox was discovered, the jury could only speculate as to whether it was originally commingled with his personal effects. In no particular order, the agents testified that the lockbox was observed on a chair, on the floor, and on the mattress. The record indicates that Gonzalez-Camargo and Girlfriend shared the bedroom, and presumably its only mattress, blanket, and pillows. The State also never linked Gonzalez-Camargo to the cell phones on the chair. Thus, only one of the three locations of the lockbox—on the floor

near the laptop computers—could be fairly said to be intermingled with Gonzalez-Camargo's personal items. *See id.* ¶ 34 (relying, in part, on the fact that the defendant's "personal items were intermingled with the equipment being used to produce meth"). Agent Metcalf was the only witness to testify that the lockbox was on the floor, but he also acknowledged that Agent Spann may have recorded the video showing the lockbox on the mattress before he entered the north bedroom.

¶24 It is also unknown whether the lockbox was locked or unlocked when first discovered, and the State offered no evidence that Gonzalez-Camargo possessed a key. *Cf. State v. Hansen*, 732 P.2d 127, 132 (relying, in part, on the defendant's possession of a key to a lockbox, and his earlier denial that he had a key to it). While the video shows the box closed, Agent Call testified that it was open, Agent Lucey could not recall whether the lockbox was open or closed when he first observed it on a chair in the north bedroom, and Agent Metcalf did not indicate whether it was open or closed. Additionally, unlike the fingerprint in *Workman*, the State presented no forensic evidence tying Gonzalez-Camargo to the lockbox. *See* 2005 UT 66, ¶¶ 3, 34 (relying, in part, on the defendant's fingerprint on a container found with methamphetamine laboratory equipment). Finally, Gonzalez-Camargo made no statements to imply a guilty conscience concerning the drugs and gave no indication that he has previously used drugs. *Compare id.* ¶ 34 (relying, in part, on the defendant's statements implying she had a guilty conscience and her admission of previous drug use in affirming her conviction based on constructive possession), *with Spanish Fork City v. Bryan*, 1999 UT App 61, ¶ 9, 975 P.2d 501 (relying, in part, on the wife's lack of incriminating statements to reverse her conviction based on constructive possession).

¶25 We consider the facts of this case similar to those present in *Spanish Fork City v. Bryan*, 1999 UT App 61, 975 P.2d 501. There, law enforcement officers discovered hypodermic needles underneath the mattress of the bed the defendant shared with her husband and found other paraphernalia in plain view in their home. *Id.* ¶ 2. Based on this evidence at a bench trial held in absentia, the defendant was convicted of constructively possessing the paraphernalia, and she appealed. *Id.* ¶ 3. This court noted that the *Bryan* defendant was not present during the search, she made no incriminating statements, and there was "no evidence that she used or intended to use the items for illegal purposes." *Id.* ¶ 9. Although the paraphernalia was found in the living space that she shared with her husband, we concluded that the evidence of possession was

insufficient because "neither possibilities nor probabilities can substitute for certainty beyond a reasonable doubt." *Id.* ¶¶ 10, 12.

¶26   Here, the State has failed to establish a sufficient nexus between Gonzalez-Camargo and the drugs from which a jury could find beyond a reasonable doubt that he knowingly and intentionally possessed the methamphetamine. The only evidence tying Gonzalez-Camargo to the lockbox is that he was present, along with approximately twelve to fourteen other people, when the police executed the search warrant, and that the lockbox was discovered somewhere in the bedroom that he shared with Girlfriend. "Because inferences constitute virtually the entire case against [Gonzalez-Camargo], the factual evidence in this case is inconclusive as to whether [he] possessed the items found in [the north bedroom]." *See id.* ¶ 11. We therefore vacate Gonzalez-Camargo's conviction of possession of methamphetamine.

## II. Hearsay Evidence

¶27   Gonzalez-Camargo next challenges his conviction of receiving stolen property. *See generally* Utah Code Ann. §§ 76-6-408(1), -412(1)(d) (LexisNexis 2012). Gonzalez-Camargo argues that because the incident report contained factual events and details of the case, it should have been excluded as inadmissible hearsay. Gonzalez-Camargo further argues that admission of the hearsay evidence violated his constitutional right to confront the witnesses against him. The State concedes that the admission of the incident report was prejudicial error. *See* Utah R. Evid. 802 ("Hearsay is not admissible except as provided by law or by these rules.");[6] *State v. Bertul*, 664 P.2d 1181, 1184 (Utah 1983) ("Police records of routine matters are admissible . . . such as the day a crime was reported. . . . On the other hand, police reports containing non-routine information as to which the memory, perception, or motivation of the reporter may raise a serious question of reliability, are inadmissible." (internal citation omitted)); *State v. Morrell*, 803 P.2d 292, 298 (Utah Ct. App. 1990) (stating the general rule that "[p]olice reports are not eligible for admission" under the business or public records exceptions of rule 803 of

---

[6]Because the 2011 amendments to the Utah Rules of Evidence "are intended to be stylistic only," we cite the current version for the convenience of the reader. *See* Utah R. Evid. 802, 2011 advisory committee's note.

the Utah Rules of Evidence). We therefore reverse Gonzalez-Camargo's conviction of receiving stolen property and remand for a new trial on that charge.[7]


CONCLUSION

¶28   From the evidence presented at trial, a reasonable jury could not find that Gonzalez-Camargo had the power and the intent to exercise dominion and control over the methamphetamine. We therefore vacate his conviction of possession of methamphetamine. Additionally, the State concedes that it was prejudicial error to admit the incident report as evidence that the computer was stolen. We therefore reverse Gonzalez-Camargo's conviction of receiving stolen property and remand for a new trial on that count.


_____
Carolyn B. McHugh, Judge


-----


¶29   WE CONCUR:


_____
Gregory K. Orme, Judge


_____
Michele M. Christiansen, Judge

---

[7]Because we conclude that reversal is merited based on the improper admission of hearsay evidence, we decline to address Gonzalez-Camargo's claim that his constitutional right to confront the witnesses against him was violated. "It is a fundamental rule that this court should avoid addressing constitutional issues unless required to do so." *State v. Nelson*, 2007 UT App 34, ¶ 15, 157 P.3d 329 (citation and internal quotation marks omitted).