2014 UT App 14

**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael W. THOMPSON, Defendant and Appellant.**

**No. 20080546–CA.**

Court of Appeals of Utah.

Jan. 16, 2014.

---

1222

Linda M. Jones, Troy L. Booher, and Noella A. Sudbury, for Appellant.

Sean D. Reyes and Mark C. Field, for Appellee.

Judge CAROLYN B. McHUGH authored this Opinion, in which Judges GREGORY K. ORME and JAMES Z. DAVIS concurred.

McHUGH, Judge:

¶ 1 Michael W. Thompson appeals from his conviction on two counts of forcible sodomy, both first degree felonies. *See* Utah Code Ann. § 76–5–403(1) to –403(3) (LexisNexis 2003) (current version at Utah Code Ann. § 76–5–403 (LexisNexis Supp.2013)). Among other things, he claims that he received ineffective assistance of counsel. Specifically, Thompson asserts that trial counsel failed to investigate or challenge the qualifications of the State's rebuttal witness, failed to object to the witness's testimony as improper extrinsic character evidence, failed to object to instances of prosecutorial misconduct, and failed to object to defective jury instructions. We agree that trial counsel performed deficiently in some respects and

that but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been more favorable to Thompson. Accordingly, we reverse and remand for a new trial.

## BACKGROUND [1]

¶ 2 Thompson's convictions arose out of events involving a sixteen-year-old girl (A.T.), at a time when Thompson was a thirty-two-year-old long-haul truck driver living in Wisconsin. In late August 2002, Thompson and a friend (Friend) were passing through Salt Lake City and stayed two nights at A.T.'s home. Over a year and a half later, in April or May 2004, A.T. reported to the police that on the second morning of Thompson's 2002 visit, Thompson and A.T. engaged in two acts of oral sex. As a result, the State ultimately charged Thompson with two counts of forcible sodomy.

¶ 3 At a three-day jury trial in March 2007, the State called A.T. as the only witness in its case-in-chief.· She testified that in early August 2002, around her sixteenth birthday, she accompanied Thompson on a long-haul trip. While stopped in Laramie, Wyoming, and then again when they reached Thompson's house in Wisconsin, Thompson and A.T. kissed and engaged in oral sex.[2] A.T. also testified that in late August 2002, Thompson and Friend stayed two consecutive nights at A.T.'s house in Salt Lake City. Thompson's convictions are based on A.T.'s testimony that Thompson came into her downstairs bedroom around 9:00 a.m. or 9:30 a.m. on the second morning of that visit and that he and A.T. engaged in two acts of oral sex.

¶ 4 Thompson testified in his own defense, stating that he and Friend stayed at A.T.'s house for two nights in August 2002, but not consecutively. According to Thompson, they arrived in the evening on August 20 and left for Las Vegas and California the next morning. Thompson testified that he and Friend arrived back in Salt Lake City on August 24 and spent a second night at A.T.'s house. However, Thompson denied having oral sex with her. Thompson claimed that he and Friend left early the next morning because they were transporting produce. Specifically, Thompson indicated that on the morning of August 25 he "got up at 6:00 a.m., got ready and got out of there," and that he and Friend "were rolling ... by 6:30 in the morning" Central Time. Thompson asserted that A.T.'s account could not be accurate because he was on the road at the time she alleged the offenses had occurred. When asked whether he had driver's logs for this trip, Thompson said he did and that he kept daily logs in accordance with federal law. Thompson's trial counsel then moved to excuse Thompson and to recall him later in the trial, and the prosecutor deferred cross-examination until Thompson was recalled.

¶ 5 Next, Friend testified, corroborating Thompson's account that they stayed at A.T.'s house on two separate nights. Friend testified that on the first morning at A.T.'s house, August 21, he awoke between 8:00 a.m. and 9:00 a.m. Central Time, but that on the second morning, August 25, he awoke between 6:30 a.m. and 7:30 a.m. Mountain Time. He stated that Thompson was still asleep when Friend awoke the second morning and that when Thompson awoke around 7:30 a.m., Friend and Thompson went outside for a few minutes to talk and smoke. When they returned inside, A.T. was awake and upstairs. Friend indicated that he and Thompson packed their things and left for Wisconsin shortly thereafter. On cross-examination, Friend testified that Thompson awoke at 9:00 a.m. "that morning," with the context of the testimony making the date ambiguous.

¶ 6 Subsequently, Thompson was recalled to the stand. On cross-examination, the prosecutor asked Thompson about Friend's testimony. Interpreting Friend's reference to "that morning" as a reference to August

---

1. "On appeal from a jury trial, we view the 'facts in a light most favorable to the jury's verdict' and 'present conflicting evidence only as necessary to understand issues raised on appeal.' Because the conflicting testimony is relevant to our analysis, we include it as indicated." *State v. Losee,* 2012 UT App 213, ¶ 1 n. 2, 283 P.3d 1055 (quoting *State v. Holgate,* 2000 UT 74, ¶ 2, 10 P.3d 346).

2. These incidents are not the basis of the current charges.

25, the prosecutor highlighted a possible discrepancy in Friend's testimony about when he and Thompson awoke on August 25. The prosecutor asked, "So, one of those wasn't true. Which one was the truth? It was either you got up at 9:00, or you got up at 7:15. Or maybe it was something else. Why don't you tell us what happened." In response, Thompson explained that he could not be "a hundred percent right to the second, time, hour, everything" of the time he arose on that morning, which was six years before trial. When pressed again about the possible discrepancy, Thompson said there was "[n]o way [he] could have got up at 9:00" because he was "under a produce load," which could result in significant financial liability if delivered late.[3]

¶ 7 During cross-examination, the prosecutor also asked about A.T.'s testimony that Thompson and A.T. had also had oral sex in Laramie, Wyoming. Thompson denied the allegation, stating, "No. Personally, I don't go through Laramie, Wyoming." At another point during cross-examination, Thompson stated that commercial truck drivers are required to take an eight-hour break after every ten hours of driving (the Ten–Hour Rule). The prosecutor asked Thompson whether he followed this rule "religiously," and Thompson said he did.

¶ 8 At some point during trial, Thompson's trial counsel had disclosed to the prosecutor, without any prior notice, that he intended to introduce Thompson's commercial truck driver's logs. The defense offered the driver's logs to undermine A.T.'s credibility and to support Thompson's testimony that he could not have had oral sex with A.T. at the time she claimed on August 25, 2002, because he was already on his way back to Wisconsin. The prosecutor moved to exclude the driver's logs because they had been provided on short notice despite being within the scope of an earlier discovery request. The trial court denied the prosecutor's motion, but allowed

him to use the lunch break to find a rebuttal witness.

¶ 9 Thompson's trial counsel offered the driver's logs as an exhibit on redirect. Thompson testified that the driver's logs were "accurately kept by [him] as a driver" and that if the driver's logs says "that's the time that [he was] in those places, [then] that's the time that [he was] in those places." Thompson's driver's logs indicated that he arrived in Salt Lake City on August 20 at 10:30 p.m. Central Time and drove to Las Vegas the next day. The logs also show that he and Friend returned to A.T.'s house on August 24 and that they "left Salt Lake City at 6:30 [a.m. Central T]ime" on August 25. Relying on the driver's logs, Thompson asserted that "the testimony of [A.T.] that [he] had been with her at 9:00 o'clock, or possibly 10:00 o'clock in the morning [Mountain Time], would not be accurate."

¶ 10 On re-cross examination, the prosecutor again asked Thompson whether he followed the Ten–Hour Rule "religiously" and whether he kept his driver's logs accurately. Thompson testified that he tried to follow the Ten–Hour Rule, that he kept his driver's logs accurately to the best of his ability, and that he did not "cook[ ] the books." The prosecutor also elicited testimony from Thompson explaining that truck drivers are limited to seventy hours of on-duty time in a seven-day period (the Seventy–Hour Rule).[4] At the end of Thompson's testimony, the trial court received the driver's logs into evidence.

¶ 11 After the lunch break, the State offered a civilian transportation specialist for the Utah Highway Patrol (Specialist), as a rebuttal witness to challenge the accuracy of Thompson's driver's logs. Specialist testified that he supervised training and instruction of the safety inspection division and motor vehicle safety section of the Utah Highway Patrol and that he had expertise in the area of training relating to drivers' hours of service. Specialist then described a computer software program called PC*Miler, which uses

---

3. Some confusion resulted from imprecise questioning, the fact that three witnesses were testifying to different times relating to two separate mornings six years in the past, and the fact that witnesses switched back and forth between referring to Mountain Time and Central Time.

4. A later witness testified that the Seventy–Hour Rule covered an eight-day period.

trucking routes and speed limits to estimate travel times. Specialist presented a report generated using the PC*Miler program that calculated the time it would have taken Thompson to drive the trip reflected in his driver's logs from Rapid City, North Dakota, to Salt Lake City, Utah, on August 20, 2002. Relying on the PC*Miler report, Specialist testified that Thompson's trip covered between 664 and 727 miles, depending on the route, and would have taken over fourteen hours to travel on either route. Specialist further opined that Thompson's driver's log entry indicating that he traveled the distance in ten hours could not be accurate because it was "not physically possible." Specialist informed the jury that Thompson "definitely" violated the Ten–Hour Rule and the Seventy–Hour Rule. Specialist further concluded that Thompson had "cooked the books" to avoid documenting violations of the rules governing how many hours a truck driver can spend on the road without a break. On cross-examination, Specialist admitted that he did not know the exact route Thompson traveled, the applicable speed limits, or the speed at which Thompson was traveling. Specialist also acknowledged that he could not say with certainty that Thompson was out of compliance as he could only give "an estimate." However, trial counsel did not inquire into Specialist's involvement in the preparation of the PC*Miler report or the data used to generate the report, or otherwise challenge Specialist's qualifications or testimony.[5]

¶ 12 At the close of evidence, the trial court asked counsel whether they had reviewed the jury instructions and whether they would "stipulate that those jury instructions are the law that should be given to the jury prior to closing arguments." Thompson's trial counsel responded in the affirmative. The trial court then stated, "The prosecution and defense have stipulated that the 29 jury instructions are the law that should be given to the jury prior to closing argument," and neither the prosecutor nor trial counsel registered any objections. Thereaf-

ter, the trial court used the approved instructions to instruct the jury on the elements of forcible sodomy. The instructions did not expressly indicate the mental state required for a criminal conviction. In addition, the instructions defined lack of consent according to the language of Utah Code section 76–5–406 but also instructed jurors that they were "not prevented from determining that circumstances outside those listed above amount to lack of consent."

¶ 13 During closing arguments, the prosecutor made a number of statements indicating that A.T. and Specialist were credible and that Thompson and Friend were not. He also opined on the ways in which Thompson's body language was consistent with untruthfulness. The prosecutor then stressed the impact on A.T. and asked the jury to "send[ ] a message to the defendant." Finally, the prosecutor argued that there had been no evidence presented that Thompson had never traveled through Laramie, Wyoming—one of the places where A.T. claimed an uncharged incident of oral sex had occurred. Thompson's trial counsel did not object to any of these statements.

¶ 14 On March 7, 2008, the jury found Thompson guilty on both counts of forcible sodomy. Subsequently, the trial court sentenced Thompson to concurrent terms of five years to life for each count. Thompson timely appealed and made a motion for remand to the trial court pursuant to rule 23B of the Utah Rules of Appellate Procedure to develop the factual record concerning Thompson's claim that trial counsel provided ineffective assistance. We granted Thompson's 23B motion and remanded for an evidentiary hearing on factual issues concerning the claim of ineffective assistance of trial counsel.

¶ 15 At the rule 23B hearing, conducted by a judge other than the trial judge due to the latter's retirement, Thompson's trial counsel admitted that he was aware of the existence of the driver's logs but initially did not believe it would be necessary to use them at trial. Trial counsel testified that he decided

---

5. When the prosecutor offered the PC*Miler report as an exhibit at the end of Specialist's testimony, trial counsel objected. The court heard arguments on the objection off the record. After

a remand under rule 23B of the Utah Rules of Appellate Procedure, the trial court found that trial counsel "did not make objections to evidence presented through [Specialist]."

to use the logs when he saw them the day before trial and that he gave the logs to the State the next day. Trial counsel admitted that, for strategic reasons, he did not produce the driver's logs to the prosecutor before that date despite an almost year-old discovery request. Trial counsel explained that because the State has the burden to establish that discovery in a criminal matter is needed, it was his practice to disregard discovery requests until the State had convinced the trial court to order production. In light of trial counsel's belated decision to use the logs and the resulting late notice given to the State, trial counsel did not expect the prosecutor to find a rebuttal expert. Trial counsel also testified that he did not seek a continuance to investigate Specialist's credentials or the PC*Miler report, or to find a surrebuttal expert, based on his belief that any continuance would work a hardship on Thompson and his family who had traveled to Utah to attend the trial. He also indicated that he was familiar with the trial judge, who did not like protracted litigation, delays, or taking breaks, and who wanted all of his cases to move along quickly. Trial counsel claimed that he evaluated what requests and objections to make based on the probable outcome. However, he denied that he would make a decision contrary to Thompson's interest merely because the trial court wanted the case to be concluded quickly and admitted that, in hindsight, he "might handle this case differently today."

¶ 16 A senior vice president at ALK Technologies (ALK), the company that developed the PC*Miler program used at trial, also testified at the 23B hearing. He explained that the PC*Miler program was developed twenty-four years ago and that ALK was now on the twenty-fourth version of the software. The ALK vice president indicated that although Thompson drove the route in 2002, the report Specialist used at trial had been generated using a 1997 version of the PC*Miler software. The ALK vice president further testified that even using the 1997 version of the program, including its original default settings, he had been unable to duplicate the travel time indicated in the report Specialist used at trial. It was only when the ALK vice president reduced the interstate speed limit from seventy-five to fifty-five miles per hour that he was able to generate a travel time close to that in the report offered by Specialist. When the ALK vice president ran the 1997 version of the program using the actual speed limits in place in 2002, the resulting travel time was nine hours and thirty-eight minutes. He also calculated the travel time with the 2002 version of the PC*Miler program—the version he recommended using to estimate travel times for a trip taken in 2002—which resulted in a time of eleven hours and thirty-three minutes when using the default settings and nine hours and thirty-six minutes when using the actual speed limits. According to the ALK vice president, the travel time results used at trial were "out of the range" of the results obtained using not only PC*Miler, but competing programs as well.

¶ 17 Specialist admitted at the 23B hearing that he did not generate the PC*Miler report used at trial and was not present when it was generated. Instead, Specialist indicated that he had called a colleague who ran the report and faxed it to him. Specialist testified that he did not ask for this colleague to alter the program's settings, but also that he had no way of knowing if those settings had been changed.

¶ 18 Based on the evidence at the 23B hearing, the trial court found that trial counsel did not inquire about Specialist's qualifications; request his curriculum vitae; request a break to meet with Specialist to discuss the PC*Miler report, foundational issues, or other relevant issues concerning his testimony; or request a continuance. In addition, the trial court found that trial counsel did not object to Specialist's testimony, attempt to contact representatives of the company that produced PC*Miler, or otherwise investigate the program or report.

¶ 19 In addition, the trial court found that "PC*Miler is programmable software, and the results rely on the abilities of the end user and the end user's interpretations." The trial court determined that Specialist did not have "the requisite knowledge, skill, experience, training and education to qualify as an expert for the PC*Miler Program," but

that the ALK vice president did. The trial court further found that "[b]ased on proper use of the PC*Miler program, even if Thompson had to slow down at times while driving the route from Rapid City to Salt Lake City, Thompson could drive the route identified for August 20, 2002, in 10 hours."

## ISSUES AND STANDARDS OF REVIEW

██ ¶ 20 Thompson raises several allegations of ineffective assistance of counsel. "In ruling on an ineffective assistance claim following a Rule 23B hearing, we defer to the trial court's findings of fact, but review its legal conclusions for correctness." *State v. Bredehoft,* 966 P.2d 285, 289 (Utah Ct.App. 1998) (citation and internal quotation marks omitted).

██ ¶ 21 Thompson claims that even if none of trial counsel's errors individually prejudiced his defense, the cumulative effect of these errors warrants reversal of his convictions and remand for a new trial. "Whether ... errors can be classified as cumulatively harmful turns on whether the errors undermine our confidence in the verdict." *State v. Palmer,* 860 P.2d 339, 350 (Utah Ct.App.1993).[6]

## ANALYSIS

### I. Ineffective Assistance of Counsel

¶ 22 Thompson argues that trial counsel performed deficiently by (A) failing to object to evidence that was inadmissible under rules 404, 405, and 608 of the Utah Rules of Evidence as extrinsic evidence used to establish an untruthful character or untruthfulness on a particular occasion; (B) failing to challenge the State's rebuttal witness and the foundation of a report on which the witness relied but which had not been generated by him; and (C) failing to object to numerous instances of prosecutorial misconduct.[7]

██ ¶ 23 The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. *See* U.S. Const. amend. VI; *Strickland v. Washington,* 466 U.S. 668, 684–86, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To support a claim that this right has been violated, the defendant must show that his attorney's representation "fell below an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052; *accord State v. Hales,* 2007 UT 14, ¶ 68, 152 P.3d 321. To make such a showing, the defendant "must overcome the strong presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment." *State v. Bullock,* 791 P.2d 155, 159–60 (Utah 1989). Furthermore, "an ineffective assistance claim succeeds only when no conceivable legitimate tactic or strategy can be surmised from counsel's actions." *State v. Tennyson,* 850 P.2d 461, 468 (Utah Ct.App.1993); *see also State v. Larrabee,* 2013 UT 70, ¶ 19.

¶ 24 We address each of Thompson's arguments in turn but reserve our analysis of the prejudicial effect of any error until our consideration of cumulative harm.

A. Trial Counsel Did Not Perform Deficiently by Failing to Object to the Specialist's Testimony Under Rules 404, 405, and 608.

¶ 25 Thompson argues that the State used Specialist's testimony to establish Thompson's character for untruthfulness in violation of rules 404, 405, and 608 and that trial counsel was ineffective for not objecting to it. The State responds that this testimony was rebuttal or impeachment evidence rather than character evidence because it "went

---

**6.** Thompson also advances his arguments under the doctrine of plain error. However, we do not address Thompson's plain error arguments because we ultimately conclude that trial counsel's ineffectiveness violated Thompson's Sixth Amendment right to a fair trial, and viewing the cumulative effect of trial counsel's ineffectiveness, our confidence in the verdict is undermined. *See infra* ¶ 86. Reversal on this basis

obviates the need to consider the additional issues raised on appeal.

**7.** Given our resolution of this appeal, we need not address Thompson's argument that his counsel also performed deficiently by failing to call a surrebuttal expert witness.

only to his credibility on the accuracy of his driver's logs" and, therefore, rules 404, 405, and 608 do not apply. Alternatively, the State argues that Thompson opened the door to Specialist's rebuttal testimony when he relied on his driver's logs to establish that he could not have had oral sex with A.T. when she claimed. The State contends that Thompson's assertions "that his driver's logs were accurate, that he followed the rules, and that he did not 'cook' his books" allowed it to "introduce on rebuttal any testimony or evidence which would tend to contradict, explain or cast doubt upon the credibility of [Thompson's] testimony." (Citation and internal quotation marks omitted.) Thompson counters that the State could not use its cross-examination of him to open the door to rebuttal on collateral matters.

■ ¶ 26 Rule 404 states that subject to enumerated exceptions, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in conformity with the character or trait." Utah R. Evid. 404(a)(1); *see also id.* R. 404(a)(2), (a)(3), (c) (listing exceptions).[8] If character evidence is admissible under one of the exceptions listed in rule 404(a), the methods of proving character are limited by rules 405 and 608. *See State v. Leber,* 2009 UT 59, ¶¶ 13, 20, 216 P.3d 964; *State v. Campos,* 2013 UT App 213, ¶¶ 87, 90, 309 P.3d 1160; *see also* Utah R. Evid. 608 advisory committee note (stating that rule 608 "should be read in conjunction with Rule 405"). Rules 405 and 608 generally limit character evidence to testimony about the person's reputation and testimony in the form of an opinion. Utah R. Evid. 405(a); *id.* R. 608(a); *Leber,* 2009 UT 59, ¶ 13, 216 P.3d 964; *Campos,* 2013 UT App 213, ¶¶ 87, 90, 309 P.3d 1160. However, under rules 405 and 608, specific instances of conduct may be inquired into on cross-examination of the character witness "for the purpose of challenging the credibility of the reputation or opinion testimony." *See Leber,* 2009 UT 59, ¶ 20, 216 P.3d 964; *see also* Utah R. Evid. 405(a); *id.* R. 608(b). In addition, rule 405 allows evidence of specific instances of con-

duct to be introduced "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense." Utah R. Evid. 405(b). Finally, rule 608 provides that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." *Id.* R. 608(b).

¶ 27 For any of these rules to be applicable here, Specialist's testimony must have been offered to establish Thompson's character or character trait. *See id.* R. 404(a) (limiting the admissibility of "[e]vidence of a person's character or character trait"); *id.* R. 405(a) (governing the methods of proving "a person's character or character trait"). And rule 608 is even more limited in application, governing only evidence offered "to attack or support the witness's character for truthfulness." *Id.* R. 608(b).

¶ 28 "Character evidence is evidence of a person's general propensity, such as the propensity to be honest or truthful. It refers to *broad, cross-situational traits*—propensities that supposedly influence a wide range of conduct." Roger Park & Tom Lininger, *The New Wigmore: A Treatise on Evidence: Impeachment and Rehabilitation* § 3.1, at 91 (2012) (emphasis in original) (footnote omitted). Furthermore, the ban on extrinsic evidence of specific instances of conduct "applies only when the specific act is being used to show character." *Id.* § 3.2, at 109. "Sometimes specific acts of lying may be admissible for a non-character purpose." *Id.; see also id.* § 3.3.2, at 121 (noting that "where the extrinsic proof relates to a substantive issue in a lawsuit, it is also admissible"). Thus, if extrinsic evidence is "not offered as character evidence, then it is not covered by the ban." *Id.* § 3.3.3, at 121; *see also id.* § 3.3.3, at 122 ("There are many ways in which extrinsic evidence of bad acts by a witness might be offered for some purpose other than showing character.").

■ ¶ 29 Rule 608 of the Utah Rules of Evidence expressly incorporates this limita-

---

8. The Utah Rules of Evidence have been amended since Thompson's trial. *See* Utah R. Evid. 404 advisory committee note. Because the changes are not material to the resolution of this appeal, we cite the current version of the rules unless otherwise noted.

tion, stating that extrinsic evidence of specific conduct is not admissible to attack or support a witness's *character for truthfulness*. *See* Utah R. Evid. 608(b). But this limitation does not apply to evidence used to directly rebut a witness's testimony or other evidence. *See* Park & Lininger, *The New Wigmore* § 3.3.3, at 122 (noting that although extrinsic evidence of other acts may "incidentally reflect on character for truthfulness," such extrinsic evidence is not covered by rule 608's ban when it is offered "for some purpose other than showing character"). Previously, rule 608 stated that extrinsic evidence could not be used "for the purpose of attacking or supporting the witness' [s] credibility." *See* Utah R. Evid. 608(b) (2004). The rule was amended effective November 1, 2004, replacing the reference to "credibility" with "character for truthfulness." *Id.* (2005). The 2004 amendment was intended to make Utah's rule consistent with rule 608 of the Federal Rules of Evidence, which had been similarly amended in 2003. *See id.* advisory committee note; Fed.R.Evid. 608 advisory committee notes (2004). The advisory committee notes to the federal rule state that "the overbroad term 'credibility'" was replaced with "character for truthfulness" to emphasize that the rule excluded extrinsic evidence "only if the sole purpose for offering the evidence was to prove the witness'[s] character for veracity," "leav[ing] the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 403." Fed.R.Evid. 608 advisory committee notes (2004).

¶ 30 Therefore, once the defendant offers evidence or makes an assertion as to any fact, the State may cross-examine or introduce on rebuttal any testimony or evidence "which would tend to contradict, explain or cast doubt upon the credibility *of his testimony.*" *State v. Green*, 578 P.2d 512, 514 (Utah 1978) (emphasis added); *State v. Reed*, 820 P.2d 479, 482 (Utah Ct.App.1991).

¶ 31· Here, Specialist did not opine about Thompson's general propensity to be dishonest or untruthful. His testimony was limited to an opinion about the accuracy of the driver's logs Thompson placed into evidence. During Thompson's testimony, Thompson vouched for the accuracy of the driver's logs and indicated that the logs proved that A.T.'s testimony about when Thompson had oral sex with her was not accurate. Once Thompson offered the driver's logs during his testimony to establish that he was on his way to Wisconsin at the time A.T. alleged the crimes had occurred, the State could use extrinsic evidence to prove that Thompson had fabricated the information in the logs. *See* Park & Lininger, *The New Wigmore* § 3.3.3, at 122 (noting that evidence of specific instances of deceitful conduct may be used for the non-character purpose of establishing opportunity); *cf. United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir.1994) (holding that Federal Rule 608 does not apply "when extrinsic evidence is used to show that a statement made by a defendant on direct examination is false, even if the statement is about a collateral issue"). To rule otherwise would permit the defendant to introduce a document to establish a fact critical to the case without allowing the prosecution to challenge the underlying premise that the document is accurate. *See Fleming*, 19 F.3d at 1331 ("A defendant may not make false statements on direct examination and rely on the government's inability to challenge his credibility as to the truth of those statements.").

¶ 32 Nevertheless, Thompson contends that it was the State that elicited the testimony on cross-examination that was later rebutted by Specialist and, Thompson argues, "the State cannot open the door to its own rebuttal witness." *See State v. Saunders*, 1999 UT 59, ¶ 22, 992 P.2d 951 (plurality opinion) ("Given the fact that the prosecution had already introduced a great deal of specific evidence related to [the events in question], [defendant] clearly was entitled, indeed required as a practical matter, to rebut or explain that evidence by his testimony. To say that defendant 'opened the door' and therefore was responsible for the admission of the ... evidence, as the State contends, is patently incorrect."); *id.* ¶ 72 (Zimmerman, J., concurring and dissenting) (agreeing with the plurality that the defendant had not

"opened the door"). In particular, Thompson relies on the State's cross-examination of Thompson after his direct testimony that federal law mandated that he keep a daily driver's log and that he kept such logs on this trip. In response to the State's question about how many hours Thompson drove, Thompson indicated that he was not permitted to drive more than ten hours at a time without an eight-hour break. This was the first mention of the Ten–Hour Rule. The State then asked whether Thompson followed that requirement "religiously" and Thompson replied, "Yes, I do." On redirect, Thompson introduced the driver's logs and provided detailed testimony about the logs, their accuracy, and their relevance to the charges against him. The State's further questioning and rebuttal witness came in response to this testimony.

¶ 33 While the State introduced the issue of Thompson's compliance with the Ten–Hour Rule, it did so only after trial counsel elicited testimony from Thompson that he kept the driver's logs as required by law. The State presented a rebuttal witness only after Thompson testified that the logs could be relied upon to establish where he was at any given time and that the driver's logs established that A.T.'s testimony could not be true. The State was entitled to challenge the accuracy of the driver's logs to rebut Thompson's testimony, including providing an explanation for why Thompson may have kept false driver's logs even before being charged with forcible sodomy. "[W]hen a defendant waives his right not to testify, his testimony, like that of any other witness, is subject to being impeached by cross-examination or by rebuttal evidence." *State v. Houskeeper*, 2002 UT 118, ¶ 28, 62 P.3d 444 (affirming the admission of extrinsic evidence used by the prosecution to establish that the defendant lied on the stand); *see also State v. Lopez*, 626 P.2d 483, 485–86 (Utah 1981) (same); *State v. Wells*, 603 P.2d 810, 812 (Utah 1979) (same); *Green*, 578 P.2d at 514 (same); *State v. Atkin*, 2006 UT App 155, ¶ 18 & n. 2, 135 P.3d 894 (same); *Reed*,

820 P.2d at 482 (same); *State v. Tucker*, 800 P.2d 819, 822–24 (Utah Ct.App.1990) (same).[9]

¶ 34 We conclude that the State could offer extrinsic evidence on the reliability of the driver's logs to rebut Thompson's assertion that they accurately indicated that he was in transit at the time A.T. testified he had oral sex with her. Therefore, trial counsel did not perform deficiently in not objecting to the evidence on the ground that it was improper character evidence. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

B. Trial Counsel Performed Deficiently in Failing to Inquire as to Specialist's Qualifications and the Foundation for the PC\*Miler Report.

¶ 35 Although the Utah Rules of Evidence allow the State to offer extrinsic evidence to rebut Thompson's use of the driver's logs to prove he could not have committed the crimes at the time alleged by A.T., the evidence itself must be otherwise competent. The admissibility of expert testimony is governed by rule 702 of the Utah Rules of Evidence, which places the burden on the proponent of the evidence to establish that the testimony will assist the trier of fact and that the expert is qualified in the methods employed. Utah R. Evid. 702. The proponent must also make a threshold showing that the principles or methods employed are reliable, have been reliably applied, and are based upon sufficient facts or data. *Id.* If the proponent cannot make that showing, the expert testimony should not be admitted. *Haupt v. Heaps*, 2005 UT App 436, ¶ 25, 131 P.3d 252 ("[E]vidence not shown to be reliable cannot, as a matter of law, assist the trier of fact to understand the evidence or to determine a fact in issue and, therefore, is inadmissible." (alteration in original) (citation and internal quotation marks omitted)). According to Thompson, trial counsel's failure to challenge Specialist's qualifications and

9. Several cases decided before rule 608 was amended to replace "credibility" with "character for truthfulness" reach a contrary conclusion. *See State v. Speer*, 750 P.2d 186, 188–89 (Utah 1988); *State v. LeVasseur*, 854 P.2d 1022, 1024 (Utah Ct.App.1993); *State v. Martinez*, 848 P.2d 702, 704–05 (Utah Ct.App.1993).

the foundation for the PC*Miler report constitutes ineffective assistance of counsel.

¶ 36 While the burden on the defendant to prove ineffective assistance is great, it is not insurmountable. The Utah Supreme Court has instructed that counsel performs deficiently when he fails to make reasonable investigation or inquiry. *State v. Templin*, 805 P.2d 182, 188 (Utah 1990) ("If counsel does not adequately investigate the underlying facts of a case, including the availability of prospective defense witnesses, counsel's performance cannot fall within the 'wide range of reasonable professional assistance.' " (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))); *see also State v. Hales*, 2007 UT 14, ¶¶ 82–83, 152 P.3d 321 (holding that trial counsel's failure to engage an expert to review CT scans was deficient performance). Furthermore, the failure to object to inadmissible evidence may constitute deficient performance under some circumstances. *See State v. Ott*, 2010 UT 1, ¶¶ 24, 33, 247 P.3d 344 (holding that trial counsel's failure to object to the introduction of portions of a victim's impact statement at a capital sentencing hearing was objectively deficient).

¶ 37 Here, trial counsel did nothing to inquire into Specialist's qualifications or the foundation of the PC*Miler report, despite the fact that the State admitted at trial that it had hurriedly located a witness "who may or may not be an expert and may or may not be able to explain how these logs work." The entire inquiry into foundation for the report consisted of a single question asked by the prosecutor: "What does that program do?" Specialist answered, "The program goes into the shortest route or the most practical route, and it gives you a time that it would take to do it; it gives you the mileage that it would take to do that." Specialist was never asked to explain the program's reliability, how the program was used in conjunction

with the particular facts of this case, what facts or data the report was based on, or the general acceptability of the program in the relevant expert community. *See* Utah R. Evid. 702 (setting forth requirements for admission of expert testimony); *State v. Braun*, 787 P.2d 1336, 1340–42 (Utah Ct.App. 1990) (holding that it was error to admit expert opinion where "[t]he state offered no foundational testimony as to the scientific reliability or general acceptability for the [bases of the expert's] testimony," but concluding, under a prior version of rule 702, that the error was not obvious). Specialist testified without objection or voir dire into his qualifications, and the PC*Miler report was received as an exhibit without trial counsel inquiring into Specialist's involvement in its preparation or other facts establishing foundation. Trial counsel objected to the admission of the exhibit itself at the end of Specialist's testimony. However, Specialist had already discussed the contents of the report at length, without any objection from trial counsel. Relying on the report, Specialist testified that it was physically impossible for Thompson to have completed a trip in the time the driver's logs indicated that he had done so, that Thompson had definitely violated the Ten–Hour Rule, that Thompson had also violated the Seventy–Hour Rule, and that Thompson had "cooked the books." Although this testimony was damaging to Thompson's defense based on the claimed accuracy of the driver's logs, trial counsel allowed the testimony to be admitted without exploring Specialist's personal involvement in the preparation of the report, his familiarity with the PC*Miler program, or the data used to generate the report.

¶ 38 Thompson also argues that his trial counsel should have objected to Specialist's testimony because the PC*Miler report on which it was based was inadmissible hearsay.[10] The Utah Rules of Evidence prohibit

---

10. As mentioned above, trial counsel did object to the admission of the report itself. The trial court overruled the objection and admitted the report. However, because the discussion was held off the record, the basis for trial counsel's objection is not clear. Given our conclusion below that the report constituted hearsay, *see infra* ¶ 39, two possibilities present themselves

under the facts of this case: trial counsel either performed deficiently by objecting but not raising proper grounds for objection or by not doing so with sufficient specificity to obtain a ruling on the issue, or trial counsel properly objected but the trial court abused its discretion by overruling the objection and admitting the report. However, rather than focusing his appeal on the admis-

the admission of hearsay unless the evidence meets one of several specific exceptions. *See* Utah R. Evid. 802. The rules define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." *Id.* R. 801(c). A "written assertion" qualifies as a "statement," *id.* R. 801(a), and a "declarant" is limited to "the person who made the statement," *id.* R. 801(b).

¶ 39 In this case, the PC*Miler report was generated by a third party who was not present at trial. The author of the report, not Specialist, made the assertion in the report as to the time required to travel the specific routes and was thus the "declarant." Therefore, the report qualified as a statement that "the declarant does not make while testifying at the current trial or hearing." *See id.* R. 801(c)(1). The PC*Miler report asserted that it would have taken a driver over fourteen hours to travel between Rapid City, North Dakota, and Salt Lake City, Utah. The State used this assertion to undermine Thompson's claim that his driver's logs reliably established that he was not in Salt Lake City at the time A.T. reported the abuse to have occurred. The PC*Miler report was thus used "to prove the truth of the matter asserted in the statement." *See id.* R. 801(c)(2).[11]

■ ¶ 40 The State does not challenge Thompson's assertion that the PC*Miler report is hearsay. Rather, the State argues that Specialist appropriately relied on the report under rule 703 of the Utah Rules of Evidence. Rule 703 provides,

> An expert may base an opinion on facts or data in the case that the expert has been

made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Utah R. Evid. 703. The State argues that the PC*Miler report is the type of facts or data that experts in the field reasonably rely on and that Specialist could therefore use the report "to explain the basis of his opinion that [Thompson's] driver's logs were inaccurate."

¶ 41 Our supreme court rejected a similar argument in *State v. Workman*, 2005 UT 66, 122 P.3d 639. In *Workman* an expert testified, based on toxicology reports prepared by her subordinate, that substances found in the defendant's residence were methamphetamine and methamphetamine precursors. *Id.* ¶¶ 2, 5. The supreme court ruled that the report, which constituted hearsay, was not admissible under the residual hearsay exception. *Id.* ¶¶ 12–22. The State argued that the trial court's erroneous admission of the report was harmless because under rule 703, the expert "could have given basically the same testimony that she gave at trial without admitting the reports." *Id.* ¶ 24. In rejecting that argument, the supreme court explained the difference between relying on facts or data under rule 703 and testifying to the conclusions of a report:

sion of the report, Thompson focuses on his trial counsel's failure to object to Specialist's testimony about the contents of the report.

11. Thompson also argues that Specialist's reliance on the PC*Miler report violated the Confrontation Clause of the United States Constitution. *See generally* U.S. Const. amend. VI; *Williams v. Illinois*, —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012) (discussing the application of the Confrontation Clause to the in-court use of a report generated by someone who does not appear at trial); *Bullcoming v. New Mexico*, —— U.S. ——, 131 S.Ct. 2705, 180

L.Ed.2d 610 (2011) (same); *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (same). Because we conclude that Specialist's reliance on the report violated the Utah Rules of Evidence, we need not determine whether it also violated the Confrontation Clause. *See State v. Gonzalez–Camargo*, 2012 UT App 366, ¶ 27 n. 7, 293 P.3d 1121 ("It is a fundamental rule that this court should avoid addressing constitutional issues unless required to do so." (citation and internal quotation marks omitted)).

While [the expert] could conceivably testify to the general nature of the tests used, how she herself has used them, or even how [the author of the report, whom the expert supervised,] had performed such tests in the past, she could not, relying solely upon the conclusions stated in the reports, have given probative testimony on the particular tests performed to reach those conclusions.

*Id.* The court concluded that rule 703 did not allow an expert to testify as to "the conclusions drawn from the tests, absent personal involvement in the testing process." *Id.* We see no material difference between the facts of *Workman* and the present case. Specialist testified as to the conclusions of the report, stating that it would have taken Thompson at least fourteen hours to travel from Rapid City, South Dakota, to Salt Lake City, Utah. Finally, even if we assume that the conclusions of the PC*Miler report are the type of "facts or data in the case" that are covered by rule 703, the report was so unreliable in this case, as demonstrated by the 23B findings, that it could not be helpful to the jury. Thus its "probative value in helping the jury evaluate the opinion" could not "substantially outweigh[ its] prejudicial effect." *See* Utah R. Evid. 703.

▇▇▇▇ ¶ 42 The State further contends that trial counsel had "a legitimate strategic reason for not objecting to Specialist's testimony." The State argues that trial counsel knew that if he objected, the trial court might exclude Thompson's driver's logs because the late production of them placed the State at a disadvantage. However, there is no indication in the record that the trial court would have excluded the driver's logs where they were important to Thompson's defense and the State never sought an order enforcing its discovery request or excluding the logs from admission. *Cf. State v. Ison,* 2006 UT 26, ¶¶ 32–33, 135 P.3d 864 (concluding that there was no strategic reason not to try

to submit exculpatory evidence in light of its admissibility being an open question under Utah law and despite "the speculative possibility that the trial judge might have exercised his discretion" under rule 403 of the Utah Rules of Evidence to exclude it). Finally, trial counsel was not in a position to weigh the relative risks of objecting against the need to object without at least investigating whether Specialist was qualified and whether there was adequate foundation for the PC*Miler report. *See State v. Hales,* 2007 UT 14, ¶ 83, 152 P.3d 321 (concluding that defendant's trial attorneys " 'were not in a position to make a reasonable strategic choice' " not to engage an expert " 'because the investigation supporting their choice was unreasonable' " (quoting *Wiggins v. Smith,* 539 U.S. 510, 536, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003))). Accordingly, trial counsel's conduct fell below an acceptable level of performance.[12]

C. Trial Counsel Performed Deficiently in Failing to Object to Several Instances of Prosecutorial Misconduct.

▇▇▇▇▇▇ ¶ 43 Thompson next argues that several of the prosecutor's remarks during cross-examination and closing argument were improper and that trial counsel's failure to object constituted ineffective assistance of counsel. "Prosecutors are held to a high standard regarding their conduct, given 'the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office.' " *State v. Todd,* 2007 UT App 349, ¶ 17, 173 P.3d 170 (quoting ABA Standards for Criminal Justice: Prosecution Function and Defense Function § 3–5.8 cmt. (1993)). In examining a claim of prosecutorial misconduct, we first determine "if the actions or remarks call to the attention of the jurors matters they would not be justified in

---

12. At the 23B hearing, trial counsel indicated he did not seek a continuance in part because he thought that it would work a hardship on Thompson and his family who had traveled to Utah to attend the trial. The State does not argue on appeal that such concern constitutes a legitimate strategy. Nor are we persuaded that any concern for the inconvenience caused to Thompson and his family by a continuance could justify the failure to make evidentiary objections reasonably designed to prevent the greater inconvenience of a conviction and lengthy prison sentence.

considering in determining their verdict." *State v. Tillman,* 750 P.2d 546, 555 (Utah 1987).

¶ 44 It is misconduct for a prosecutor to make statements during closing argument "that prompt[ ] the jury to consider matters outside the evidence." *State v. King,* 2010 UT App 396, ¶ 22, 248 P.3d 984; *see also State v. Hopkins,* 782 P.2d 475, 478 (Utah 1989) ("[C]ounsel is precluded from arguing matters not in evidence."). However, that prohibition is balanced against the "considerable latitude" the Utah Supreme Court has afforded each side during closing arguments to "discuss fully his or her viewpoint of the evidence and the deductions arising therefrom." *State v. Bakalov,* 1999 UT 45, ¶ 56, 979 P.2d 799 (citation and internal quotation marks omitted); *King,* 2010 UT App 396, ¶ 22, 248 P.3d 984. Accordingly, prosecutors "must have the freedom to present closing argument with logical force," but they must do so "within the constraints imposed upon their office." *Todd,* 2007 UT App 349, ¶ 18, 173 P.3d 170. "Thus, the conduct of the prosecutor at closing argument is [appropriately] circumscribed by the concern for the right of a defendant to a fair and impartial trial." *Id.* ¶ 17 (alteration in original) (citation and internal quotation marks omitted).

¶ 45 Accordingly, we first determine whether the prosecutor's statements were improper. Next, we examine whether trial counsel performed unreasonably in not objecting to any improper comments. We then consider whether any deficient conduct was prejudicial. In the present case, we reserve this final issue of prejudice until our examination of Thompson's claim of cumulative harm. *See infra* Part II.

**1. Propriety of the Prosecutor's Statements**

¶ 46 Thompson argues that the prosecutor committed prosecutorial misconduct in cross-examining Thompson by (a) asking Thompson to comment on the credibility of another witness. Thompson also argues that the prosecutor committed prosecutorial misconduct during his closing argument by: (b) vouching for the testimony of A.T.; (c) vouching for the testimony of Specialist; (d) expressing his personal opinion regarding Friend's credibility; (e) stating that Thompson was lying during his testimony; (f) providing unchecked, impermissible "expert" testimony regarding Thompson's body language; (g) referring to facts not in evidence by implying that Thompson sometimes traveled through Laramie, Wyoming; and (h) appealing to the jurors' passions and prejudices. The State argues that the prosecutor's statements were merely deductions that he urged the jury to reasonably draw from the evidence.

a. The Prosecutor Did Not Improperly Ask Defendant to Comment on Another Witness's Testimony.

¶ 47 Thompson argues that in cross-examining Thompson, the prosecutor misstated the evidence, implied that either Thompson or Friend was lying, and asked Thompson to comment on the veracity of Friend's testimony. The State responds that the prosecutor sought only to clarify apparent discrepancies and general confusion between Thompson's and Friend's testimonies.

¶ 48 "[I]t is improper to ask a criminal defendant to comment on the veracity of another witness." *State v. Emmett,* 839 P.2d 781, 787 (Utah 1992). Such questioning is improper "because it is argumentative and seeks information beyond the witness's competence." *Id.* "The prejudicial effect of such a question lies in the fact that it suggests to the jury that a witness is committing perjury even though there are other explanations for the inconsistency" and "it puts the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury." *Id.* However, a prosecutor may ask questions that seek "to clarify defendant's testimony in relation to prior testimony of another witness." *State v. Taylor,* 884 P.2d 1293, 1299 (Utah Ct.App.1994). For example, in *State v. Davis,* 2013 UT App 228, 311 P.3d 538, we held that a prosecutor improperly asked the defendant whether another witness was lying about a conversation with the defendant. *Id.* ¶¶ 37–39. However, there we concluded that the prosecutorial misconduct was cured when "the trial court

reframed the question as a request for [the defendant] to repeat his own account of the disputed conversation without speculating on why his account differed from that of the [other witness]." *Id.* ¶ 39; *see also State v. Stevenson,* 884 P.2d 1287, 1289, 1291 (Utah Ct.App.1994) (stating that, "while attempting to point out how the testimony of State witnesses conflicted with defendant's testimony," the prosecutor improperly "asked defendant if he believed that the police officer and another State witness were lying," but concluding that the misconduct was harmless because "[d]efendant's answer alerted the jury that there could be conflicts in testimony based on reasons other than that one party was lying").

¶ 49 In cross-examining Thompson, the prosecutor reviewed Thompson's and Friend's testimonies about the time each witness arose the two mornings they stayed at A.T.'s house in Salt Lake City. After suggesting a discrepancy in the testimony, the prosecutor stated, "So, one of those wasn't true. Which one was the truth? It was either you got up at 9:00, or you got up at 7:15. Or maybe it was something else. Why don't you tell us what happened." The prosecutor later returned to the issue and asked, "You think [Friend is] wrong about that?"

¶ 50 The prosecutor's questions were appropriate. Thompson's argument on appeal conflates inaccuracy with perjury. By asking, "You think [Friend is] wrong about that?" and "[O]ne of those wasn't true. Which one was the truth?" the prosecutor was not suggesting perjury or asking Thompson to comment on Friend's character or motivations. Rather, the prosecutor was highlighting a perceived discrepancy in the testimony and asking Thompson to clarify his testimony in relation to Friend's testimony. *See Taylor,* 884 P.2d at 1298–99 (finding no plain error when a prosecutor's questioning served only to clarify testimony and "[a]ny inference from the prosecutor's questions that a previous witness lied [was] slight"). Such questioning appropriately furthers the search for truth in a criminal trial. *See State*

*v. Knight,* 734 P.2d 913, 920 (Utah 1987) ("Rules that govern criminal proceedings are meant to ensure that a trial is a search for truth and that the verdict merits confidence.").[13]

### b. The Prosecutor Did Not Improperly Vouch for A.T.

¶ 51 As discussed, courts grant considerable freedom during closing arguments for counsel "to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom." *State v. Lafferty,* 749 P.2d 1239, 1255 (Utah 1988) (citation and internal quotation marks omitted). However, counsel may not "assert[ ] personal knowledge of the facts in issue or express[ a] personal opinion, being 'a form of unsworn, unchecked testimony [which] tend[s] to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued.'" *State v. Parsons,* 781 P.2d 1275, 1284 (Utah 1989) (third and fourth alterations in original) (quoting *Lafferty,* 749 P.2d at 1255–56). In particular, a prosecutor must avoid " 'vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused.'" *State v. Hopkins,* 782 P.2d 475, 479 (Utah 1989) (quoting *United States v. Young,* 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

¶ 52 Vouching poses two dangers. First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.* at 479–80 (citation and internal quotation marks omitted). Second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 480 (citation and internal quotation marks omitted). Therefore, a prosecutor's statements about the veracity of

---

**13.** Thompson also argues that the prosecutor improperly misstated the evidence. To the extent the prosecutor did misstate the evidence, any

error was cured because the misstatement was posed as a question to Thompson, who was given the opportunity to correct it.

a witness's testimony are permissible only if it is a conclusion that "the jury could have reasonably inferred from the evidence." *See State v. Cummins,* 839 P.2d 848, 854 (Utah Ct.App.1992). In contrast, such comments are improper when "the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness'[s] credibility." *State v. Carter,* 776 P.2d 886, 892 (Utah 1989) (citation and internal quotation marks omitted).

■■ ¶ 53 During closing argument, the prosecutor made the following statements: "You had an opportunity to view [A.T.]. You could see her; you could see that she was forthright. I think you could see that she's the kind of person who would not make up a story like this to get revenge at [Thompson]"; "[A.T.] told the truth to you about Michael Thompson as well. She had nothing to gain by lying"; and "If she were making up a story about it," she could have said other things, but "[A.T.] told you the truth. You have every reason to believe her." Thompson argues that these statements constitute improper vouching for A.T.

¶ 54 In *State v. Bakalov,* 1999 UT 45, 979 P.2d 799, the defendant raised a similar challenge after the prosecutor stated during closing argument, "You know that [the victim] told the truth" and, "She told the truth." *Id.* ¶ 57. In rejecting the defendant's argument that these statements were impermissible testimonials to the credibility of the victim, the Utah Supreme Court distinguished between impermissible "express[ions of] personal opinion or assert[ions of] personal knowledge of the facts" and "permissible deductions from the evidence and ... assertions about what the jury may reasonably conclude from those deductions." *Id.* The supreme court concluded that the challenged comments "were not statements of personal belief but, rather, assertions about what the jury should infer from the evidence during their deliberations." *Id.* The *Bakalov* court also relied upon the fact that the prosecutor's statements were made in response to the defense's theory that the victim had fabricated the rape allegations. *Id.* Under those circumstances, the court stated that it was "very unlikely that a juror would consider these statements to be factual testimony from the prosecutor." *Id.* (citation and internal quotation marks omitted); *see also State v. Bryant,* 965 P.2d 539, 549–50 & n. 10 (Utah Ct.App.1998) (holding that the prosecutor's comparison of the victim to Aunt Bea from the Andy Griffith Show and comment that "she didn't lie once on the stand," made after defense counsel argued that the victim lied throughout trial, was not misconduct (emphasis and internal quotation marks omitted)).

¶ 55 In the present case, the prosecutor's comments clearly reflect a deduction from evidence in the record. The prosecutor expressly referred the jurors to their own observations of A.T., arguing that they "could see her" and "could see that she was forthright." Rather than expressing his personal opinion, the prosecutor stated, "I think you could see that she's the kind of person who would not make up a story like this to get revenge at [Thompson]." While the prosecutor also stated that A.T. "told the truth," he explained the basis of that deduction by pointing to the evidence that A.T. "had nothing to gain by lying" and that if she had fabricated the story, she could have made it more compelling. A fair interpretation of the prosecutor's statements is that the jurors should find that A.T. told the truth because the evidence gave them "every reason to believe her." Furthermore, the prosecutor was responding to Thompson's theory that A.T. fabricated the allegations in retaliation for Thompson's interference with A.T.'s romantic involvement with another adult. When considered in the context of the argument and evidence, it is unlikely that a juror would have interpreted the prosecutor's statements about A.T. to be based on personal opinion or knowledge of extra-record facts. The prosecutor argued that if the jurors considered the evidence and their own observations and impressions of A.T., they would see that A.T. was telling the truth. These comments were not improper.

c. The Prosecutor Impermissibly Vouched for Specialist.

■■ ¶ 56 The prosecutor's comments about Specialist's testimony highlight the dif-

ference between permissible argument and impermissible vouching. "The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' [s] credibility," either by "making explicit personal assurances of the witness'[s] credibility," or by "indicating that information not presented to the jury supports the testimony." *Carter*, 776 P.2d at 892 (citation and internal quotation marks omitted).

¶ 57 In closing argument, the prosecutor stated, "We heard from a witness, an expert, who came and testified on very short notice, and I think he was credible, that Michael Thompson was cooking his books." Unlike the statements approved in *Bakalov*, *see* 1999 UT 45, ¶ 57, 979 P.2d 799, the prosecutor here did not urge the jurors to rely on the evidence and their observations to deduce that Specialist was credible. Instead, he shared his personal opinion on the matter by explicitly stating, "I think he was credible. . . ." The prosecutor reiterated his personal assurance of Specialist's credibility during his rebuttal argument, stating, "[Y]ou heard from [Specialist]—who I think came across as a very reliable witness—that these log books were cooked." We agree with Thompson that this is improper vouching. *See United States v. Kerr*, 981 F.2d 1050, 1053–54 (9th Cir.1992) (reversing a defendant's conviction for plain error where the prosecutor impermissibly vouched for prosecution witnesses in closing argument by stating, "I think [the witness] was very candid" and, "I think [another witness] was candid. I think he was honest"). The prosecutor's indication of his personal belief in the reliability of Specialist's testimony was impermissible bolstering of Specialist's credibility that "carrie[d] with it the imprimatur of the Government and may [have] induce[d] the jury to trust the Government's judgment rather than its own view of the evidence." *See State v. Hopkins*, 782 P.2d 475, 480 (Utah 1989) (citation and internal quotation marks omitted).

d. The Prosecutor Inappropriately Expressed His Opinion of Friend's Credibility.

¶ 58 Referring to Friend's testimony during closing argument, the prosecu-

tor stated, "[Friend's] story is all over the place. I think you can tell he wasn't being forthright with you." Like the comments on A.T.'s testimony, the prosecutor's initial commentary that Friend "wasn't being forthright" was a permissible deduction from the evidence in the record. Friend had admitted he was "not positive" about the details of his testimony, and Friend had to correct and explain his testimony on several occasions. However, on rebuttal, the prosecutor argued to the jurors that they could "disregard what happened with respect to the testimony of [Friend]," stating, "I don't think [he] was credible. I think he was being dishonest with you." These later statements were "'[e]xpressions of personal opinion'" and amounted to "'a form of unsworn, unchecked testimony'" that would "'tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued.'" *See State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988) (quoting ABA Standards for Criminal Justice § 3–5.8 (2d ed.1980)). Accordingly, these statements amount to prosecutorial misconduct because they induce the jury to trust the prosecutor's judgment rather than to form their own view of the evidence. *See Hopkins*, 782 P.2d at 480.

e. The Prosecutor's Statement that Thompson Was Lying Was a Permissible Inference to Be Drawn from the Evidence.

¶ 59 The prosecutor also attacked Thompson's testimony by arguing that his "story" was "incredible" and that he was "lying, lying" about the logs because he "has a lot at stake" and "has everything to gain by lying." This court has suggested that the law is unclear on whether calling a defendant a liar is improper. *See State v. Otterson*, 2008 UT App 139, ¶ 24, 184 P.3d 604 (assuming, without deciding, that it was error for the State to call the defendant a liar during closing argument, but holding that the error was harmless because it could be fairly inferred from the evidence that the defendant had lied); *State v. Johnson*, 2007 UT App

184, ¶¶ 45–46, 163 P.3d 695 (same); *id.* (collecting cases on the split of authority among jurisdictions on whether it is improper for the prosecutor to call a criminal defendant a liar during closing argument). However, subsequent cases have made clear that a prosecutor's statement that a witness is lying is analyzed under the same test as any other comment on the credibility of a witness:

> To be clear, the evil to be guarded against in such cases is that a juror would consider [such] statements to be factual testimony from the prosecutor. Consequently, a prosecutor engages in misconduct when he or she expresses personal opinion or asserts personal knowledge of the facts. However, a prosecutor may draw permissible deductions from the evidence and make assertions about what the jury may reasonably conclude from those deductions.

*State v. Davis*, 2013 UT App 228, ¶ 35, 311 P.3d 538 (alteration in original) (citations and internal quotation marks omitted).

¶ 60 For example, in *State v. Bragg*, 2013 UT App 282, 317 P.3d 452, we held that a prosecutor's statement was improper, though harmless under the facts of that case, when he stated during cross-examination of the defendant, " 'Would it surprise you that I don't believe a word you just told me?' " *See id.* ¶¶ 25–26. In contrast, in *State v. Lebeau*, 2012 UT App 235, 286 P.3d 1, *cert. granted*, 298 P.3d 69 (Utah 2013), we rejected a defendant's claim of misconduct despite the prosecutor's statement during closing argument that the defendant had lied to his girlfriend in a telephone call from jail. *Id.* ¶¶ 9, 20. We held that the prosecutor's comment was a reasonable inference based on the evidence. *Id.* ¶ 20; *see also Davis*, 2013 UT App 228, ¶¶ 31–36, 311 P.3d 538 (finding no plain error when prosecutor asked defendant whether he had lied when he made several statements); *State v. Cummins*, 839 P.2d 848, 854 (Utah Ct.App.1992) (concluding that "the prosecution's reference to defendant as a liar, while intemperate, only disclosed what the jury could have reasonably inferred from the evidence").

¶ 61 Here, the jury would not have viewed the prosecutor's statements as expressions of personal opinion or assertions of personal knowledge. A fair inference from Thompson's confused testimony and its apparent inconsistency with that of A.T., Friend, and Specialist was that Thompson lied about the time he left Salt Lake City on the morning of the offense. Likewise, the evidence fairly supported the prosecutor's statement that Thompson had a motive to lie because he had everything to lose if he were convicted.

**f. The Prosecutor Impermissibly Offered Unchecked Expert Opinion and Argued Matters Not in Evidence.**

■ ¶ 62 The prosecutor did not limit his attack on Thompson's credibility to what could be inferred from the record. The prosecutor's closing argument also included his opinion on how to use body language as a lie detection method:

> And I hope you observed him. I hope you observed his body language. It was very negative. [Thompson] had his hands out before him like this, blocking. I think that's a classic sign of someone who's hiding. And if you noticed, when I would ask him a question of particular significance about the acts he performed on [A.T.], he would shut his eyes and shake his head 'no.' To me that's a classic sign of his dishonesty. He couldn't look me in the eyes and tell me the answer to the question.

These comments were improper and amounted to prosecutorial misconduct.

■ ¶ 63 In closing arguments, a prosecutor may draw "reasonable inferences based upon the demeanor of the witness." *Cummins*, 839 P.2d at 854. However, "counsel is precluded from arguing matters not in evidence." *State v. Hopkins*, 782 P.2d 475, 478 (Utah 1989). Furthermore, "a prosecutor engages in misconduct when he or she expresses personal opinion or asserts personal knowledge of the facts." *State v. Bakalov*, 1999 UT 45, ¶ 57, 979 P.2d 799.

¶ 64 At no point during Thompson's trial did any expert testify regarding the physical gestures or verbal cues that may generally indicate that a witness is being untruthful. The prosecutor's statements consisted of improper factual testimony. *See id.* Further-

more, by instructing the jurors as an expert on how to interpret Thompson's body language, the prosecutor impermissibly intruded on the jurors' role as the fact-finders. *Cf. State v. Graham*, 2011 UT App 332, ¶ 32, 263 P.3d 569 ("It is within the province of the jury, as the finder of fact, to make credibility determinations.").[14] Consequently, the prosecutor's statements constituted misconduct. *See Bakalov*, 1999 UT 45, ¶ 58, 979 P.2d 799 ("It is error for a prosecutor to bolster his or her case by implying 'that a jury has an obligation to convict a defendant on some basis other than solely on the evidence before it.'" (quoting *State v. Andreason*, 718 P.2d 400, 402 (Utah 1986) (per curiam))).

g. The Prosecutor's Argument Regarding Thompson's Presence in Laramie, Wyoming, Was a Permissible Inference from the Evidence.

■■■ ¶ 65 During closing argument, the prosecutor also stated, "You never heard any testimony from [Thompson] that he had never gone through Laramie. [A.T.] talked about oral sex that occurred in Laramie, Wyoming." Thompson argues that this commentary establishes that the prosecutor misrepresented evidence during closing argument because when asked on cross-examination if he had had oral sex with A.T. in Laramie, Thompson testified, "No. Personally, I don't go through Laramie, Wyoming."

¶ 66 In context, we are not convinced that the prosecutor misrepresented the evidence. Immediately after making his initial statement that the jury had not heard testimony that Thompson had never traveled through Laramie, the prosecutor clarified that although Thompson generally takes a travel route that does not include Laramie, the jury "didn't have any testimony that's the route that Mr. Thompson always takes, that he's never been in Laramie." Although the initial statement could be interpreted as inconsistent with Thompson's trial testimony, the prosecutor quickly acknowledged Thompson's testimony and argued only that Thompson had not explicitly denied *ever* traveling through Laramie. In the context of the evidence and the closing argument in its entirety, the prosecutor's statement falls within the "considerable latitude" given to counsel in making closing argument and was a permissible inference "of the evidence and the deductions arising therefrom." *See Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799 (citation and internal quotation marks omitted).

h. The Prosecutor Impermissibly Appealed to the Jurors' Passions and Prejudices.

■■■ ¶ 67 A prosecutor may not "'make arguments calculated to appeal to the prejudices of the jury.'" *State v. Todd*, 2007 UT App 349, ¶ 19, 173 P.3d 170 (quoting ABA Standards for Criminal Justice: Prosecution Function and Defense Function § 3–5.8(c) (1993)). Thus, a prosecutor's com-

---

14. Furthermore, this court has held that this type of body language interpretation can constitute reversible error even when it has been introduced through a trial witness. *See State v. Vail*, 2002 UT App 176, ¶ 15, 51 P.3d 1285 (reversing the defendant's conviction of child sexual abuse because a detective's "testimony as to whether the [victims] exhibited those [body language] indicators that [the detective] equates with trustworthiness [was] inadmissible") (citing Utah R. Evid. 608(a)); *cf. State v. Rimmasch*, 775 P.2d 388, 392 (Utah 1989) (holding that one witness may not testify as to the credibility of statements made by another person). Other jurisdictions have rejected attempts to instruct the jury on how to assess credibility from a witness's body language. *See, e.g., United States v. Williams*, 133 F.3d 1048, 1052–53 (7th Cir.1998) (reversing the defendant's conviction because, among other reasons, a special agent "purport[ed] to be a human lie detector" by describing the defendant's body language during an interview); *State*

*v. Christiansen*, 144 Idaho 463, 163 P.3d 1175, 1180–81 (2007) (holding that the prosecutor's attempt to elicit an opinion from a police interviewer about the defendant's truthfulness based on his body language and demeanor was "clearly improper"); *Tolliver v. State*, 922 N.E.2d 1272, 1278–79 (Ind.Ct.App.2010) (disapproving of "body language testimony" and holding that the trial court erred in finding police officer was a "skilled witness" who was "somehow uniquely qualified" to assess the defendant's truthfulness based on body language (internal quotation marks omitted)). *But see People v. Theis*, 2011 IL App (2d) 091080, ¶¶ 51–59, 357 Ill.Dec. 425, 963 N.E.2d 378 (concluding that prosecutor's discussion of witness's body language was invited by defense counsel's initial discussion of witness's body language and was based on the evidence, which included an interviewer's statement describing the witness's conduct in an interview and the videotape of the interview).

ments are improper if they invoke the passion and prejudice of the jury by "asking jurors to put themselves in the victim's place," *id.*, stating "how a victim would have testified had he or she been alive to testify," *id.*, suggesting that the jury should find the defendant guilty "out of vengeance or sympathy for the victim," *State v. Campos,* 2013 UT App 213, ¶ 52, 309 P.3d 1160, or "contending that the jury has a duty to protect the alleged victim—to become her partisan," *State v. Wright,* 2013 UT App 142, ¶ 41, 304 P.3d 887. "Furthermore, 'reference to the jury's societal obligation' is inappropriate when it suggests that the jury base its decision on the impact of the verdict on society and the criminal justice system rather than the facts of the case." *Campos,* 2013 UT App 213, ¶ 51, 309 P.3d 1160 (quoting *State v. Dunn,* 850 P.2d 1201, 1224 (Utah 1993)); *see also Andreason,* 718 P.2d at 402; *State v. Smith,* 700 P.2d 1106, 1112 (Utah 1985). Such argument "diverts [the jurors'] attention from their legal duty to impartially apply the law to the facts in order to determine if [the defendant] had committed the crimes ... for which he was on trial." *See Wright,* 2013 UT App 142, ¶ 41, 304 P.3d 887.

¶ 68 During his closing argument, the prosecutor indicated that "this is the kind of crime that occurs very often," and toward the end of his argument he stated, "[A.T. is] going to be dealing with the emotional and psychological scarring[ ] of this for a long time. She's going to have to deal with it for the rest of her life...." Additionally, the prosecutor told the jury, "[Y]our [guilty] verdict is vital, because it sends a message to [Thompson] that what he did was wrong, that you know that what he did was wrong, and that you're not going to stand for it. That the people of Utah won't stand for that kind of crime."

¶ 69 The prosecutor's comments regarding the long-term effects of these crimes on A.T. were "a self-evident proposition well within the common understanding of lay jurors." *See State v. Cummins,* 839 P.2d 848, 854 n. 12 (Utah Ct.App.1992). Such self-evident propositions have been held to be either permissible, *see id.* at 853–54 & n. 12, or harmless, *see State v. Pearson,* 943 P.2d

1347, 1352–53 (Utah 1997) (concluding that although the prosecutor referred to facts outside the evidence, the reference was harmless because the comments "addressed matters that are within the general realm of human experience and common sense"). Furthermore, the comments were not likely to inflame the passions of the jurors. The statement that A.T. would deal with the effects of the alleged crimes for the rest of her life was unlike the statements we have found improper in other cases. *See Campos,* 2013 UT App 213, ¶ 52, 309 P.3d 1160 (deeming improper a reference to the defendant's " 'stealing from [the victim] his ability to run, his ability to bike, his ability to walk his daughter down the aisle' "); *Wright,* 2013 UT App 142, ¶ 41, 304 P.3d 887 (deeming improper the statement " '[y]ou have the power to make that [ [(the abuse) ] stop' " (alteration in original)); *Todd,* 2007 UT App 349, ¶ 21, 173 P.3d 170 (deeming improper "several impassioned references to what [the victim] 'might have told [the jury]' had she been alive to testify" (second alteration in original)). Here, the prosecutor's comments simply acknowledged the likely long-term effect of the alleged crime on A.T. without calling for the jurors to protect A.T. from future offenses, place themselves in her position, or seek revenge or otherwise act on their sympathy for A.T.

¶ 70 However, the prosecutor's statement was made in conjunction with an unsupported factual assertion that "this is the kind of crime that occurs very often," and with an admonition that the jury should use its verdict to send a message to Thompson. Asking the jury to send a message to the defendant may not be as egregious as asking the jury to send a message to other potential criminals. *See Andreason,* 718 P.2d at 402 (deeming improper the statements that the type of criminal behavior in question was "pervasive" and that "everytime we have a jury trial, people are watching. People are watching to see how we administer justice.... [T]hese two Defendants ... are not the only ones we need to be concerned about"); *United States v. Sanchez,* 659 F.3d 1252, 1256–57 (9th Cir.2011) (holding that the prosecutor's request that the jury "send a

memo" to other drug traffickers urged the jury to convict for reasons irrelevant to the defendant's guilt or innocence); *State v. Woodard*, 2013 ME 36, ¶¶ 16, 32–36, 68 A.3d 1250 (holding that the trial court's failure to intervene when the prosecutor requested that the jury "send a message" to other would-be criminals with a guilty verdict was plain error). However, the prosecutor's argument that a guilty verdict would send a message that the people of Utah would not stand for such crimes does suggest that the jury should "find [the defendant] guilty out of vengeance." *See Campos*, 2013 UT App 213, ¶ 52, 309 P.3d 1160. The statement was thus impermissibly calculated to inflame the passions of the jurors and diverted the attention of the jurors from their duty to impartially apply the law to the facts of this case. *See Wright*, 2013 UT App 142, ¶ 41, 304 P.3d 887. Such argument is inappropriate.

## 2. Deficient Performance

¶ 71 Thompson's trial counsel performed deficiently by failing to object to or otherwise challenge the repeated instances of prosecutorial misconduct. The prosecutor's unchecked testimony about Thompson's body language was particularly egregious and should have drawn some response. Because the critical issue before the jury was whether Thompson or A.T. was telling the truth, we can conceive of no reasonable trial strategy that would include failing to object to this misconduct. *See State v. Larrabee*, 2013 UT 70, ¶ 19. While the other instances of prosecutorial misconduct, standing alone, may not have required an objection from trial counsel, the repeated impropriety required some response. Several of the instances of prosecutorial misconduct involved witness credibility, an issue which was central to this case. *See infra* ¶¶ 80–81, 84. Left unchecked, the prosecutor was able to bolster Specialist's testimony, undermine Friend's testimony, and inflame the passions of the jurors against Thompson. Accordingly, trial counsel performed deficiently by not objecting, responding in rebuttal, or requesting curative instructions relating to these repeated instances of prosecutorial misconduct. *See State v. Ison*, 2006 UT 26, ¶ 32, 135 P.3d 864 (concluding that trial counsel

performed deficiently when there was no strategic reason for counsel's actions).

## II. Cumulative Harm

¶ 72 We have concluded that trial counsel's performance was deficient for failing to investigate and challenge Specialist's qualifications and the foundation for the PC*Miler report, for failing to object to Specialist's testimony as hearsay, and for failing to object to repeated instances of prosecutorial misconduct during closing argument. We now consider the second prong of the ineffective assistance of counsel analysis: whether but for trial counsel's deficient performance there is a reasonable probability that the outcome of trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Hales*, 2007 UT 14, 152 P.3d 321, ¶ 68, 152 P.3d 321. Such a reasonable probability exists "when the appellate court's confidence in the verdict is undermined." *State v. Whittle*, 1999 UT 96, ¶ 17, 989 P.2d 52. In our analysis of this issue, we consider the cumulative effect of trial counsel's ineffectiveness. *See State v. Campos*, 2013 UT App 213, ¶¶ 61, 72, 309 P.3d 1160 (reversing based on the cumulative prejudicial effect of trial counsel's deficient performance).

¶ 73 "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). "While we more readily find errors to be harmless when confronted with overwhelming evidence of the defendant's guilt, we are more willing to reverse when a conviction is based on comparatively thin evidence." *State v. King*, 2010 UT App 396, ¶ 35, 248 P.3d 984 (citation omitted); *see also Strickland*, 466 U.S. at 695–96, 104 S.Ct. 2052. Likewise, courts are more likely to reverse a jury verdict if the pivotal issue at trial was credibility of the witnesses and the errors went to that central issue. *See, e.g., State v. Templin*, 805 P.2d 182, 188–89 (Utah 1990) (deeming prejudicial counsel's failure to investigate and call a

witness who would have undermined victim's testimony and explaining that because the testimony of the uncalled witness "affects the credibility of the only witness who gave direct evidence of defendant's guilt, the testimony affects the 'entire evidentiary picture'" (quoting *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052)); *State v. Rimmasch*, 775 P.2d 388, 407–08 (Utah 1989) (concluding, but not in the context of an ineffective assistance claim, that there was a reasonable likelihood of a more favorable outcome when the case "hinged on a determination of credibility," there was no corroborating physical evidence, and the victim's version of events was bolstered principally by inadmissible expert testimony), *superseded by rule on other grounds as stated in State v. Maestas*, 2012 UT 46, 299 P.3d 892.

¶ 74 We begin our assessment of the cumulative impact of trial counsel's deficient performance with the failure to investigate or object to Specialist's qualifications and the foundation for the PC*Miler report. We are assisted in this task by the trial court's findings entered after the 23B hearing that Specialist "lacked the requisite knowledge, skill, experience, training and education to qualify as an expert for the PC*Miler program"; "did not generate the printout he used at trial"; and "was not physically present when the printout was generated." Based on these findings, we conclude that proper inquiry by trial counsel would have revealed deficiencies in Specialist's qualifications and the foundation for the PC*Miler report. Notwithstanding these failings, the State argues that Specialist's testimony and the PC*Miler report would have been admissible even if challenged at trial.

¶ 75 The State first contends that Specialist was not offered as an expert in the PC*Miler software but as "a transportation specialist with expertise in the area of driver's logs and hours of service in the trucking industry." If Specialist's testimony had been confined to explaining the use of driver's logs and the limitations on truck driver hours generally, the State's argument might be persuasive. However, Specialist opined not only on those requirements but on Thompson's compliance with them. His opinion that Thompson had cooked his books and that the travel times recorded in his driver's logs were not possible was formed based on the PC*Miler report that he had not prepared and was not qualified to testify about.

¶ 76 Next, the State contends that Specialist was entitled to rely upon the report because the PC*Miler program did not require specialized training to operate and Specialist used it routinely throughout his career. Unlike the free online programs such as MapQuest that the State uses as a comparison, the PC*Miler program is a commercial product developed specifically for the trucking industry that allows the user to customize various settings and to modify other features affecting the results. Specialist admitted that he had never used those aspects of the PC*Miler program and that he did not know what settings were used to generate the report he relied upon at trial. Under these circumstances, he was not qualified to offer an opinion based upon the PC*Miler report used at trial.[15]

¶ 77 We now turn to the prejudicial effect, if any, that Specialist's testimony based on the inadmissible report had on the outcome of the trial. Thompson argues that "[t]he inadmissible evidence went to the central issue of credibility and unfairly tipped the balance against [him]." The State disagrees and claims that Specialist's testimony served only to rebut Thompson's statements and that even without this testimony, there was "sufficient reason for the jury to question the veracity of [Thompson's] version of events." The State points to the inconsistency between Thompson's and Friend's testimonies about the time Thompson awoke on the morning of the alleged crimes, as well as the lack of supporting documentation to verify the accuracy of the driver's logs. The State also contends that trial counsel "essentially neutralized Specialist's testimony through an effective cross-examination," thereby minimizing any prejudicial impact.

**15.** The State also argues that the prosecutor could have simply called the preparer of the report to testify had Thompson's trial counsel objected to Specialist's testimony based on the report. However, this assertion is speculative and not supported by any citation to the record.

¶ 78 First, it is not surprising that Friend and Thompson could not be certain of the times and sequences of activities they engaged in on a morning approximately six years before their trial testimony. That is why the driver's logs and Thompson's testimony that the logs accurately reported the time he left Salt Lake City were critical pieces of evidence for the defense. Indeed, A.T. also had inconsistencies in her statements. She first reported the allegations through a written statement given to the police. However, in a subsequent interview with the police, she did not mention the sexual allegations against Thompson and even stated that nothing happened, though she explained at trial that she thought the interviewer had been asking about the first morning Thompson was at her house. Second, while trial counsel's impromptu cross-examination of Specialist was skillful, it was not a substitute for preventing Specialist from testifying in the first instance. Trial counsel established through cross-examination that Specialist did not know the assumptions underlying the report, but the jury was still left with the impression that a computer program routinely used by the Utah Highway Patrol indicated that the times stated in Thompson's driver's logs were not physically possible and proved that Thompson fabricated his driver's log entries to avoid being cited for regulatory violations. As a result, Specialist's testimony effectively undermined the defense theory that the driver's logs established that Thompson was on his way to Wisconsin at the time A.T. claims he had oral sex with her.

¶ 79 In *State v. Workman*, 2005 UT 66, 122 P.3d 639, the Utah Supreme Court used two considerations to guide its decision on the prejudicial impact of a trial court's error in admitting lab reports as proof that certain substances seized at a crime scene were methamphetamine and methamphetamine precursors without making the analyst available for cross-examination. *Id.* ¶¶ 26–27. Each consideration turned on the centrality of the inadmissible evidence to the state's case. *See id.* First, the court noted that it was not necessary to prove that controlled substances or precursors were present to establish the charged crime—that the prem-

ises were being used as a clandestine laboratory. *Id.* ¶ 26. Second, the court determined that there was "adequate independent evidence," including equipment and other ingredients, to prove the defendant was operating a methamphetamine lab without considering the erroneously admitted toxicology reports and testimony. *Id.* ¶ 27. Accordingly, the *Workman* court held that the erroneous admission of the toxicology reports was harmless. *Id.* ¶ 28.

¶ 80 Here, the State was not required to prove the inaccuracy of Thompson's driver's logs to prove forcible sodomy, nor, as the State notes, was it required to prove the precise time of any offense. *Cf. id.* ¶ 26. Nevertheless, the State was required to prove that Thompson, in fact, engaged in two nonconsensual acts of sodomy with A.T. *See* Utah Code Ann. § 76–5–403(1), (2) (LexisNexis 2003) (current version at Utah Code Ann. § 76–5–403 (LexisNexis Supp.2013)). Because there were no witnesses to or physical evidence of the offense, the State's case was dependent upon the jury's determination of whether A.T. or Thompson was telling the truth. Specialist's testimony effectively rebutted Thompson's use of the driver's logs to establish that A.T.'s allegations could not be true with respect to the timing of the offense. Specialist testified that the travel time reflected in a particular entry was physically impossible and advanced the prosecution's theory that none of Thompson's entries could be trusted because he "cooked the books" to deceive trucking regulators. In context, Specialist's testimony and the PC*Miler report provided evidence on the central issue of who was telling the truth.

¶ 81 Furthermore, unlike in *Workman*, there was not ample evidence of Thompson's guilt in the absence of Specialist's testimony. *See* 2005 UT 66, ¶ 27, 122 P.3d 639. As discussed, there was no physical evidence of the offense or any witnesses to it. A.T. waited over a year and a half to report the incident to authorities, and when she first reported it, her allegations were arguably inconsistent as to whether the charged crimes occurred. The evidence included testimony that A.T. was a person of "questionable" honesty and had made up stories in the

past, and that her motive for doing so in this instance was retaliation for Thompson's interference with A.T.'s sexual relationship with another adult male. Similarly, her allegations of the uncharged sexual conduct involving Thompson, including the incidents in Wisconsin and Wyoming, were unsupported by physical evidence or third party corroboration and were also belatedly reported. It is also relevant to our analysis that the prosecutor relied heavily on Specialist's testimony and the PC*Miler report for his statement during closing argument that Thompson lied.

¶ 82 However, we need not decide whether trial counsel's deficient performance in not investigating or objecting to Specialist's qualifications or the foundation for the PC*Miler report standing alone was harmful. Trial counsel also performed deficiently by failing to object to numerous instances of prosecutorial misconduct during closing argument, including vouching for the testimony of Specialist, expressing his personal opinion regarding Friend's credibility, instructing the jurors on how to determine credibility based on body language, and appealing to the jurors' passions and prejudices. Thompson argues that the prosecutor's misconduct substantially affected his right to a fair trial and improperly shaped the jury's interpretation of the evidence.

¶ 83 Our assessment of the harmful effect of these comments begins with the premise that "[a] criminal conviction is not to be lightly overturned on the basis of the prosecutor's comments standing alone." *State v. Todd*, 2007 UT App 349, ¶ 31, 173 P.3d 170 (alteration in original) (citation and internal quotation marks omitted). Instead, improper comments by the prosecutor require reversal only when they "substantially affected the defendant's right to a fair trial." *Id.* (citation and internal quotation marks omitted). That threshold is met when " 'the likelihood of a different outcome [is] sufficiently high to undermine [our] confidence in the verdict.' " *Id.* (quoting *State v. Knight*, 734 P.2d 913, 920 (Utah 1987)). In assessing the prejudicial effect of prosecutorial misconduct, "we must view those statements 'in context of the arguments advanced by both sides as well as in context of all the evidence.' " *State v. Lebeau*, 2012 UT App 235, ¶ 20, 286 P.3d 1 (quoting *State v. Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799), *cert. granted*, 298 P.3d 69 (Utah 2013). As part of that analysis, we look at the evidence of the defendant's guilt. *State v. Troy*, 688 P.2d 483, 486 (Utah 1984). "If proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial," but when the evidence is "less compelling" we "will more closely scrutinize the conduct." *Id.* (citation and internal quotation marks omitted). "If the conclusion of the jurors is based on their weighing conflicting evidence or evidence susceptible of differing interpretations, there is a greater likelihood that they will be improperly influenced through remarks of counsel." *Id.; see also State v. Andreason*, 718 P.2d 400, 403 (Utah 1986) (per curiam) ("When the evidence in the record is circumstantial or sufficiently conflicting, jurors are more likely influenced by an improper argument. In such instances, they are more susceptible to the suggestion that factors other than the evidence before them should determine a defendant's guilt or innocence."). We also examine "whether defense counsel addressed the improper statements during closing argument and the prosecution then 'restricted his [ ]rebuttal comments to the evidence and made no further mention of' the improper comments," and "whether the trial court gave a curative instruction admonishing the jury to 'dispassionately consider and weigh the evidence' and instructing them 'not to consider the statements of counsel as evidence.' " *Todd*, 2007 UT App 349, ¶ 34, 173 P.3d 170 (quoting *State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993)).

¶ 84 Here, the State's case relied almost entirely upon A.T.'s allegations, which Thompson denied. Thus, the jurors were tasked with weighing that conflicting evidence and deciding who was telling the truth. The prosecutor's improper vouching for Specialist, improper expression of opinion about Friend's credibility, and improper statements about Thompson's body language bore directly on this pivotal function of the jury. Furthermore, trial counsel failed to "address[ ] the improper statements during closing argument," and the prosecution did not thereafter

"restrict[ ] his [ ]rebuttal comments to the evidence and [make] no further mention of the improper comments." *See id.* (citation and internal quotation marks omitted). In fact, one of the prosecutor's two improper statements vouching for Specialist and the statements of personal opinion regarding Friend occurred during the prosecutor's rebuttal arguments.

¶ 85 The trial court did provide an instruction admonishing the jury to "conscientiously and dispassionately consider and weigh the evidence" and "reach a just verdict regardless of what the consequences of such verdict may be," and instructing them not to consider or be influenced by "any statement of counsel as to facts not shown in evidence" or "any statements of counsel as to what the evidence is, unless it is stated correctly." However, this instruction was provided before closing arguments, and trial counsel did not ask the trial court to remind the jury of these obligations during or immediately after closing arguments. *See id.* While this instruction may be sufficiently curative in some situations, we do not believe that is the case here due to the less-than-overwhelming evidence supporting the verdict, the pervasiveness of the prosecutor's misconduct, and the centrality of the issue of credibility to this case.

¶ 86 When the cumulative impact of trial counsel's deficiencies with respect to Specialist, the PC*Miler report, and the prosecutor's misconduct are considered, our confidence in the verdict is undermined. We are convinced that there is a reasonable probability that but for trial counsel's deficient performance, the outcome of trial would have

been different. *See State v. Larrabee*, 2013 UT 70, ¶ 37, 321 P.3d 1136. Accordingly, we reverse Thompson's convictions and remand for a new trial.

### III. Issues on Remand

¶ 87 Because it will likely arise again on remand, we next address Thompson's challenge to the trial court's jury instruction regarding lack of consent (Instruction 19).[16] *See State v. James*, 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court."). On appeal, Thompson claims that Instruction 19 is an incorrect statement of the law.[17]

¶ 88 A jury instruction must inform the jury "what each element is and that each must be proved beyond a reasonable doubt." *State v. Laine*, 618 P.2d 33, 35 (Utah 1980) (emphasis omitted). Lack of consent is an element of forcible sodomy. *See* Utah Code Ann. § 76–5–403(2) (Lexis-Nexis 2003) (current version at Utah Code Ann. § 76–5–403 (LexisNexis Supp.2013)). Section 76–5–406 of the Utah Code states that lack of consent is established by "any of the following circumstances" and then lists several sets of circumstances, three of which were included in the instruction. *See id.* § 76–5–406. But Instruction 19 deviates from the statute by also stating, "You are not prevented from determining that circumstances outside those listed above amount to lack of consent. You may also apply the common, ordinary meaning of lack of consent to the totality of the facts and circumstances in making your determination regarding lack

---

**16.** Thompson also challenges the omission of the mens rea element from the jury instruction on forcible sodomy. Because we are confident that any omission regarding the mental state required to prove forcible sodomy will not be repeated on remand, we do not address Thompson's challenge further.

**17.** Instruction 19 states,
 An act of sodomy is without consent of a person under any, all or a combination of the following circumstances:
  1. The victim expresses lack of consent through words or conduct; or
  2. The victim was 14 years of age or older, but younger than 18 years of age, and the actor

was more than three years older than the person and enticed or coerced the victim to submit or participate.
  3. The victim was younger than 18 years of age and at the time of the offense the actor occupied a position of special trust in relation to the person.
 You are not prevented from determining that circumstances outside those listed above amount to lack of consent. You may also apply the common, ordinary meaning of lack of consent to the totality of the facts and circumstances in making your determination regarding lack of consent.

of consent." Thompson argues that this language is incorrect and improperly allowed the jury to consider factors outside the statutory definition of lack of consent.

¶ 89 The Utah Supreme Court has held that "whether ... consent was present or absent in any given case is factual in nature, and is thus a matter for determination by the finder of fact." *State v. Herzog*, 610 P.2d 1281, 1283 (Utah 1980). The statute defining lack of consent for sexual offenses provides a list of "specific circumstances which will rebut an allegation of consent." *In re J.F.S.*, 803 P.2d 1254, 1257–58 (Utah Ct.App.1990). In *State v. Salazar*, 2005 UT App 241, 114 P.3d 1170, we considered the effect of that statutory list on the State's ability to prove lack of consent in a prosecution for forcible sodomy.

 ¶ 90 In *Salazar*, the defendant entered the victim's bed where she and her boyfriend were sleeping and began to perform oral sex on her. *Id.* ¶ 2. When the victim first awoke, she presumed it was her boyfriend and did not resist. *Id.* Eventually, however, the victim realized it was not her boyfriend and pushed the defendant off the bed. *Id.* The defendant fled the house, the victim reported the incident to the police, and the defendant was arrested and charged with forcible sodomy. *Id.* ¶¶ 2–3. Before trial, the defendant moved to dismiss on the ground that the victim's consent was established as a matter of law because the facts did not meet any of the circumstances establishing lack of consent listed in the statute. *Id.* ¶ 5. We rejected the defendant's argument, explaining that the statute "sets out a list of circumstances under which there is deemed to be no consent to sexual activity as a matter of law" but does not preclude the fact-finder from "determining that circumstances outside those defined in [the statute] may still amount to lack of consent in any particular case." *Id.* ¶¶ 6, 8–9. We thus concluded that the evidence was sufficient to establish lack of consent under "the common, ordinary meaning of lack of consent." *Id.* ¶ 10. Accordingly, Instruction 19 correctly indicates that the jury is "not prevented from determining that circumstances outside those listed [in the statute] amount to lack of con-

sent" and that the jury can consider whether the totality of the evidence supports a finding of lack of consent under its common, ordinary meaning.

## CONCLUSION

¶ 91 Trial counsel performed deficiently by failing to investigate or challenge the qualifications of the State's rebuttal witness and the foundation for the PC*Miler report, by failing to object to the rebuttal witness's testimony, and by failing to object to repeated instances of prosecutorial misconduct during closing argument. The cumulative effect of these errors undermines our confidence in the verdict and convinces us that, but for trial counsel's deficient performance, there is a reasonable probability that the outcome would have been different. As a result, we reverse Thompson's convictions and remand for a new trial.